OPINION OF THE COURT
COWEN, Circuit Judge.
John and Carolyn Jackson (“John” and “Carolyn”) were convicted of conspiracy to endanger the welfare of a child and endangering the welfare of a child under New Jersey law — offenses that were “assimilated” into federal law pursuant to the Assi-milative Crimes Act (“ACA”). The United States District Court for the District of New Jersey sentenced Carolyn to 24 months of imprisonment (as well as three years of supervised release). John received a sentence of three years of probation (together with 400 hours of community service and a $15,000 fine). The govern.ment appeals from these sentences.
We will vacate the sentences and remand for resentencing. Concluding that there is no “sufficiently analogous” offense guideline, the District Court declined to calculate Defendants’ applicable sentencing ranges under the Guidelines. Although we adopt an “elements-based” approach for this inquiry, we conclude that the assault guideline is “sufficiently analogous” to Defendants’ offenses of conviction. Furthermore, the District Court failed to make the requisite findings of fact — under the applicable preponderance of the evidence standard — with respect to this Guidelines calculation as well as the application of the statutory sentencing factors. We also agree with the government that the District Court, while it could consider what would happen if Defendants had been prosecuted in state court, simply went too far in this case by focusing on state sentencing practices to the exclusion of federal sentencing principles. Finally, the sentences themselves were substantively unreasonable.
I.
John, a major in the United States Army, and Carolyn, his wife, were the biological parents of three children, including “JJ.” They also became the foster parents of three young children: Joshua (born on May 13, 2005), “J” (born on April 1, 2006), and “C” (born on April 7, 2008). The three children were eventually adopted. Joshua died on May 8, 2008.
Defendants were charged in a fifteen-count superseding indictment. These counts can be organized into three different categories: an assimilated state conspiracy charge, assimilated state substantive offenses, and substantive charges under federal law. These offenses occurred (at least in part) within the special maritime and territorial jurisdiction of the United States, i.e., at Picatinny Arsenal Installation in Morris County, New Jersey.
Count 1 charged John and Carolyn with conspiracy to endanger the welfare of a *369 child — Joshua, J, and C — under N.J. Stat. Ann. §§ 2C:24-4a and 2C:5-2 — assimilated pursuant to the ACA. From August 2005 through April 23, 2010, Defendants, “for the purpose of promoting and facilitating conduct which endangered the welfare of a child, did agree with each other to engage in acts which constituted endangering the welfare of a child whom they had assumed responsibility for and accepted a legal duty to care for, namely, [Joshua, J, and C].” (A35-A86.) They carried out this conspiracy by, inter alia, physically assaulting the children with various objects and with their hands, withholding proper medical care (and failing to seek prompt medical attention for Joshua and C), withholding sufficient nourishment from the children (and adequate water from J and C), forcing J and C to consume food that caused them pain and suffering, such as red pepper flakes, hot sauce, and/or raw onion, causing C to ingest excessive sodium or sodium-laden substances, and employing cruel and neglectful disciplinary and child-rearing techniques.
Counts 2 to 12 and Count 15 charged offenses under assimilated New Jersey law for endangering the welfare of a child (and aiding and abetting such endangerment) in violation of § 2C:24-4a and 18 U.S.C. § 2. Specifically, Defendants allegedly caused harm to the children in various ways, made them “neglected” children, and children “upon whom cruelty had been inflicted, as defined in N.J.S.A. Sections 9:6-1 and 9:6-3.” (A39-A49, A52.) Counts 2 and 7 alleged that Defendants withheld sufficient nourishment and food from Joshua and C, respectively. Counts 4 and 8 similarly alleged that they withheld adequate water from J and C and-prohibited these two children from drinking water. Counts 3, 6, and 12 charged that Defendants “physically assaulted] [Joshua, J, and C, respectively] with various objects and with their hands.” (A40, A43, A49.) In Counts 5 and 9, it was alleged that Defendants forced J “to ingest hot sauce, red pepper flakes, and raw onion” (A42) and C “to ingest hot sauce and red pepper flakes” (A46). Count 10 claimed that Defendants “caus[ed] [C] to ingest excessive sodium and a sodium-laden substance while restricting [C’s] fluid intake, causing [C] to suffer hypernatremia and dehydration, a life threatening condition.” (A47.) Count 11 then charged Defendants with withholding prompt and proper medical care for C’s dehydration and elevated sodium levels. Finally, Count 15 alleged that Defendants withheld prompt and proper medical care for C’s fractured humerus.
Defendants were also accused of assaulting C with a dangerous weapon with intent to do bodily harm (and aiding and abetting this assault) in violation of 18 U.S.C. §§ 113(a)(3) and 2 (Count 13) as well as with intentionally assaulting C (and aiding and abetting such an assault) resulting in serious bodily injury in violation of 18 U.S.C. §§ 113(a)(6) and § 2 (Count 14).
Trial commenced on April 13, 2015, and lasted 39 days.[1] At the close of the government’s case, the District Court granted judgments of acquittal on Counts 13 and 14. On July 8, 2015, the jury returned guilty verdicts on Counts 1 to 12 as to Carolyn and on Counts 1, Counts 3 to 9, and Counts 11 to 12 as to John. Accordingly, both Defendants were acquitted on Count 15 (renumbered as Count 13), and John was found not guilty on Counts 2 and 10.
*370 Using the offense guidelines for assault, U.S.S.G. § 2A2.3, and aggravated assault, U.S.S.G. § 2A2.2, the Probation Office calculated both Defendants’ Guidelines range as 210 to 262 months. The government similarly calculated a sentencing range of 292 to 366 months. It sought sentences of 235 months for Carolyn and 188 months for John. A 10 1/2-hour sentencing was held on December 15, 2015. At the sentencing hearing, the District Court rendered an especially thorough ruling on the record. Declining to calculate a Guidelines sentence, it ultimately sentenced Carolyn to a term of imprisonment of 24 months (as well as three years of supervised release). John was sentenced to three years of probation (as well as 400 hours of community service and a $15,000 fine).[2]
II.
The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. This Court has appellate jurisdiction pursuant to 18 U.S.C. § 3742(b). As required by § 3742(b), the Solicitor General personally authorized the government to appeal.
This case implicates a number of rather unusual sentencing issues. This is not surprising because Defendants were not convicted and sentenced for committing enumerated federal crimes of the sort that federal courts consider on a regular basis. Instead, they were convicted and sentenced in federal court for state law offenses “assimilated” into federal law pursuant to a federal statute, the ACA. The ACA provides that:
Whoever within or upon any of the places now existing or hereafter reserved or acquired as provided in section 7 of this title, or on, above, or below any portion of the United States not within the jurisdiction of any State, Commonwealth, territory, possession, or district is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State, Territory, Possession, or District in which such place is situated, by the laws thereof in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment.
18 U.S.C. § 13(a). This statute, which in its original form dates back to the 1820s, is designed to borrow state laws in order to fill gaps that exist in federal criminal laws with respect to criminal offenses that are committed on federal enclaves. See, e.g., Lewis v. United States, 523 U.S. 155, 160-61, 118 S.Ct. 1135, 140 L.Ed.2d 271 (1998).
However, setting aside these special circumstances, we look to the generally applicable post-Booker sentencing process. The sentencing court must engage in the following three-step process: (1) calculate the defendant’s (now advisory) *371 Guidelines range; (2) formally rule on the parties’ motions for departure and, if a motion is granted, state how the departure affects the Guidelines calculation; and (3) consider the statutory sentencing factors specified in 18 U.S.C. § 3553(a) and determine the appropriate sentence to impose. See, e.g., United States v. Tomko, 562 F.3d 558, 567 (3d Cir. 2014) (en banc). We review sentences for both procedural as well as substantive reasonableness. See, e.g., id.
III.
A. “Sufficiently Analogous” Offense Guidelines
We begin, as we must, with the Guidelines. Pursuant to U.S.S.G. § 2X5.1, the sentencing court, in cases where the offense is a felony for which no guideline expressly has been promulgated, applies the “most analogous” offense guideline. Defendants are correct that this Court should adopt an “elements-based” approach to this inquiry — which calls for a comparison between the elements of the offense of conviction with the purportedly analogous offense guideline and the elements of the various federal offenses covered by this guideline. However, we also agree with the government that, under this approach, the assault guideline is “sufficiently analogous” to Defendants’ offenses of conviction. The District Court accordingly committed reversible error by concluding that there is no “sufficiently analogous” offense guideline in this case.
The “Applications Instructions” direct the sentencing court to begin by “[d]eter-min[ing], pursuant to § 1B1.2 (Applicable Guidelines), the offense guideline section from Chapter Two (Offense Conduct) applicable to the offense of conviction.” U.S.S.G. § 1B1.1(a)(1) (citing U.S.S.G. § 1B1.2). U.S.S.G. § 1B1.2(a) (“Applicable Guidelines”) states, inter aha, that the sentencing court should “[d]etermine the offense guideline section in Chapter Two (Offense Conduct) applicable to the offense of conviction (ie., the offense conduct charged in the count of the indictment or information of which the defendant was convicted).” This guideline provides basic instructions on how to identify the offense guideline section:
Refer to the Statutory Index (Appendix A) to determine the Chapter Two offense guideline, referenced in the Statutory Index for the offense of conviction. If the offense involved a conspiracy, attempt, or solicitation, refer to § 2X1.1 (Attempt, Solicitation, or Conspiracy) as well as the guideline referenced in the Statutory Index for the substantive offense. For statutory provisions not listed in the Statutory Index, use the most analogous guideline. See § 2X5.1 (Other Offenses).
Id.
The Sentencing Commission’s commentary explains that § 1B1.1 provides the basic rules for determining the guideline applicable to the offense conduct under Chapter Two (Offense Conduct). “The court is to use the Chapter Two guideline section referenced in the Statutory Index (Appendix A) for the offense of conviction.” U.S.S.G. § 1B1.2 cmt. n.l. “However, ... for statutory provisions not listed in the Statutory Index, the most analogous guideline, determined pursuant to § 2X5.1 (Other Offenses), is to be used.” Id. “In the case of a particular statute that proscribes only a single type of criminal conduct, the offense of conviction and the conduct proscribed by the statute will coincide, and the Statutory Index will specify only one offense guideline for that offense of conviction.” H. The commentary to § 1B1.2 also deals with the situation where the particular statute proscribes a variety of conduct that might constitute the subject of different offense guidelines — and the Statutory *372 Index specifies more than one offense guideline for that particular statute: “[T]he court will determine which of the referenced guideline sections is most appropriate for the offense conduct charged in the count of which the defendant was convicted.” M. “For statutory provisions not listed in the Statutory Index, the most analogous guideline is to be used. See § 2X5.1 (Other Offenses”).” Id; see also id. (“If the offense involved a conspiracy, attempt, or solicitation, refer to § 2X.1 (Attempt, Solicitation, or Conspiracy) as well as the guideline referenced in the Statutory Index for the substantive offense.”).
U.S.S.G. § 2X5.1 (“Other Felony Offense”) states the following:
If the offense is a felony for which no guideline expressly has been promulgated, apply the most analogous offense guideline. If there is not a sufficiently analogous guideline, the provisions of 18 U.S.C. § 3553 shall control, except that any guidelines and policy statements that can be applied meaningfully in the absence of a Chapter Two offense guideline shall remain applicable.
If the defendant is convicted under 18 U.S.C. § 1841(a)(1), apply the guideline that covers the conduct the defendant is convicted of having engaged in, as that conduct is described in 18 U.S.C. § 1841(a)(1) and listed in 18 U.S.C. § 1841(b).
The commentary to § 2X5.1 states in relevant part that this guideline applies only to felony offenses not referenced to Appendix A (Statutory Index) (and accordingly U.S.S.G. § 2X5.2 (Class A Misdemeanors (Not Covered by Another Specific Offense Guideline)) should be used for Class A misdemeanors). U.S.S.G. § 2X5.1 cmt. n.3. It then states:
Background: Many offenses, especially assimilative crimes, are not listed in the Statutory Index or in any of the lists of Statutory Provisions that follow each offense guideline. Nonetheless, the specific guidelines that have been promulgated cover the type of criminal behavior that most such offenses proscribe. The court is required to determine if there is a sufficiently analogous offense guideline, and, if so, to apply the guideline that is most analogous. In a case in which there is no sufficiently analogous guideline, the provisions of 18 U.S.C. § 3553 control.
The sentencing guidelines apply to convictions under 18 U.S.C. § 13 (Assimilative Crimes Act) and 18 U.S.C. § 1153 (Indian Major Crimes Act); see 18 U.S.C. § 3551(a), as amended by section 1602 of Public Law 101-647.
Id. cmt. background.
There are three basic tests that could be used to identify a “sufficiently analogous” offense guideline: (1) an “elements-based” approach, i.e., “[wjhether there is a sufficiently analogous guideline to a particular crime is generally a task of comparing the elements of the defendant’s crime of conviction to the elements of federal offenses already covered by a specific guideline,” United States v. Nichols, 169 F.3d 1255, 1270 (10th Cir. 1999) (citing United States v. Allard, 164 F.3d 1146, 1149 (8th Cir. 1999); United States v. Osborne, 164 F.3d 434, 437 (8th Cir. 1999)); (2) “comparing various Guidelines to ‘the facts alleged in the indictment’” (Appellant’s Brief at 28 (quoting United States v. McEnry, 659 F.3d 893, 899-901 (9th Cir. 2011))); or (3) a broader approach in which the sentencing court must take into account all of the circumstances and make factual findings to support its ultimate selection. Although it contends that “the assault Guidelines are sufficiently analogous offense Guidelines” under the “elements-based” approach (id. at 33), the government asks the Court to adopt the second *373 test, what we call the “indictment-facts” approach. We, however, determine that the “elements-based” approach should apply.[3]
Initially, the precedential “indictment-facts” case law cited by the government generally “pertain to the scope of inquiry when more than one guideline is assigned to a statute or when no guideline is assigned and the court determines that more than one guideline is sufficiently analogous [and must therefore select the ‘most analogous’ offense guideline].” (John’s Brief at 24.) In United States v. Boney, 769 F.3d 153 (3d Cir. 2014), cert. denied, — U.S. -, 135 S.Ct. 1003, 190 L.Ed.2d 877 (2015), this Court concluded that the district court failed to select the “most appropriate” offense guideline for the offense conduct charged in the counts of which the defendant was convicted pursuant to Application Note 1 of § 1B1.2, id. at 154-63. Likewise, we considered in United States v. Aquino, 555 F.3d 124 (3d Cir. 2009), which of two offense guidelines specified in the Statutory Index for a particular federal offense was the “most appropriate” guideline under this § 1B1.2 commentary and then applied the respective offense guidelines’ cross-references, id. at 125-31. In another Third Circuit case cited by the government, we specifically addressed several issues that arose as a consequence of the sentencing court applying the “most analogous” offense guideline. United States v. Cherry, 10 F.3d 1003, 1005 (3d Cir. 1993) (“This appeal requires us to decide several issues which arise when the United States Sentencing Guidelines ... do not contain a provision expressly applicable to the offense for which a defendant has been convicted and the district court applies a guideline deemed to be most analogous to the offense of conviction.”).
While the government does not cite to any precedential opinion adopting its understanding of the “sufficiently analogous” guideline inquiry,[4] the Fifth, Eighth, and Tenth Circuits have adopted the “elements-based” approach. This approach began with the Eighth Circuit’s 1999 ruling in United States v. Osborne, 164 F.3d 434 (8th Cir. 1999).
According to the Eighth Circuit, “[t]he first step of the USSG § 2X5.1 analysis is to determine whether there are any guidelines which are sufficiently analogous to the defendant’s crime; if there are no sufficiently analogous guidelines, then the defendant is to be sentenced using the general provisions of 18 U.S.C. § 3553(b),” id. at 437 (footnote omitted) (citing United States v. Cefalu, 85 F.3d 964, 966-69 (2d Cir. 1996)). The Osborne court held that a de novo standard of review applies to this initial step bécause, among other things, “the issue most generally will involve comparing the elements of federal offenses to the elements of the crime of conviction.” Id.; see also id. (“Secondly, a determina *374 tion that there is not a sufficiently analogous guideline will require the district court to impose sentence under 18 U.S.C. § 3553(b), which we are convinced is a legal issue.”).
The government takes issue with this ruling, claiming that the Eighth Circuit offered no support for its approach. But the Osborne court did offer a persuasive explanation based on the Background Note to § 2X5.1 and the distinction the Sentencing Commission draws between a “sufficiently analogous” offense guideline, on the one hand, and the “most analogous” such guideline, on the other hand:
The background note to USSG § 2X5.1 states specifically, “The court is required to determine if there is a sufficiently analogous guideline and, if so, to apply the guideline that is most analogous. Where there is no sufficiently analogous guideline, the provisions of 18 U.S.C. § 3553(b) control.” USSG 2X5.1, comment, (backg’d). This portion of the application note mandates a two-step analysis, and makes abundantly clear that there is a difference between a situation where the district judge is choosing the most analogous guideline among sufficiently analogous guidelines, and a situation where there is no sufficiently analogous guideline. In construing the guideline and the application note, we must give meaning to each of these terms.
Id.[5]
The Eighth Circuit went on to conclude that a deferential standard of review applies to the district court’s “most analogous” guideline selection, indicating that the district court must take into account the circumstances of the case and make its own factual findings. Id. at 437-38. “Absent an indication that the district court misunderstood the legal standards, that is, it misunderstood the elements of the state offense or the analogous federal offenses, we will defer to its judgment as to how the facts fit into those elements.” Id. at 438 (citing United States v. Mariano, 983 F.2d 1150, 1158 (1st Cir. 1993)). Furthermore, the Osborne court noted that choosing the “most analogous” offense guideline involves more than just interpretation of the various guidelines (but instead implicates the applicability of different guidelines to the facts). Id.
In this case, the government agrees with the Eighth Circuit that “[wjhether there is a sufficiently analogous offense Guideline is a legal question subject to plenary review.” (Appellant’s Brief at 25 (citing United States v. Cothran, 286 F.3d 173, 176-77 (3d Cir. 2002); Aquino, 555 F.3d at 127).) According to the Osborne court, the divergent standards of review strike the appropriate balance between avoiding unwarranted sentencing disparities and imposing individualized sentences. Id. “With appellate courts reviewing the sufficiency question de novo, defendants will not receive sentences based on wholly inapplicable guidelines.” Id. Nevertheless, § 2X5.1 cases “are inherently out of the ordinary; the Commission does not offer a predetermined guideline or offense level.” Id. “By giving due deference to the district court’s choice of the most analogous guideline, district courts will have more freedom to fashion the appropriate sentence in these unconventional situations on a case by case basis.” *375 Id.; see also United States v. Allard, 164 F.3d 1146, 1147-50 (8th Cir. 1999) (companion case to Osborne applying same principles).
The Fifth Circuit as well as the Tenth Circuit have followed the Eighth Circuit’s example by comparing the elements of the defendant’s offense of conviction with the elements of federal offenses covered by a specific offense guideline in order to ascertain whether, as a legal matter, this guideline is “sufficiently analogous” to the offense of conviction. See, e.g., United States v. Rakes, 510 F.3d 1280, 1287-88 (10th Cir. 2007); United States v. Calbat, 266 F.3d 358, 363 (5th Cir. 2001); Nichols, 169 F.3d at 1269-71.
In support for its assertion that a plenary standard of review applies to this inquiry, the government cites to our opinion in United States v. Cothran, 286 F.3d 173 (3d Cir. 2002). Cothran strongly weighs in favor of the “elements-based” approach.
In that case, the defendant was convicted of conveying false information and threats about carrying an explosive device on an airplane in violation of 49 U.S.C. § 46507, and he contested the district court’s “finding that the United States Sentencing Guideline (U.S.S.G.) § 2A6.1 [ (Threatening or Harassing Communications)] was the most analogous offense guideline for Cothran’s crime [as opposed to U.S.S.G. § 2K1.5 (Possessing Dangerous Weapons or Materials While Boarding or Abroad an Aircraft) ].” Id. at 174. Observing that the courts are split vis-a-vis the applicable standard of review, we turned to Osborne’s “comprehensive and cogent analysis of the standard to be applied.” Id. at 176.
“The [Eighth Circuit] noted that there is a two-step process involved: first, the district court must determine whether there is a sufficiently analogous offense guideline, and, if there is, it then must determine which guideline is most analogous.” Id. at 177 (citing Osborne, 164 F.3d at 437). It “held that the first step, determining whether there is a sufficiently analogous guideline, is a legal question and is reviewed de novo.” Id. (citing Osborne, 164 F.3d at 437). According to Cothran, the Osborne court correctly identified the standard of review to apply to the first step “[b]ecause determining whether there is an analogous guideline is substantially interpreting and applying the guidelines.” Id. The Cothran Court then accepted Osborne’s “logical” analysis with respect to the “most analogous” guideline inquiry, applying a deferential standard of review as to the district court’s factual findings and application of the guidelines to these facts. Id. (citing Calbat, 266 F.3d at 363 n.1).
While the Cothran Court did not specifically mention Osborne’s “elements” language (and did not actually conduct the initial “sufficiently analogous” guideline inquiry), we did express approval for the Eighth Circuit’s “cogent” analysis of the applicable standards of review. The Eighth Circuit adopted these standards for the “sufficiently analogous” guideline inquiry specifically because the first step would require district courts to look only to the elements, while the second step would require factual findings. Cothran thus adopted the elements-based inquiry from Osborne.
Even though we must look to the respective elements, we stress that this inquiry must be conducted in a flexible and open-ended fashion. After all:
Numerous sections of the sentencing guidelines direct the court to apply the offense level of the federal offense most “analogous” to a particular unlawful activity; it would be unreasonable to read into every one of these sections the requirement that, in order to apply the *376 analogous offense guideline, the sentencing court must effectively retry the defendant for an otherwise unrelated of-. fense. “[A]nalogy does not mean identity. It implies difference.” Sturm v. Ulrich, 10 F.2d 9, 11 (8th Cir. 1925).
United States v. Langley, 919 F.2d 926, 930-31 & n.8 (5th Cir. 1990) (citing inter alia § 2X5.1). In turn, the Tenth Circuit explained that “the court first had to ask what analogous provisions were within the ballpark; it then had to ask which represented the best fit.” Rakes, 510 F.3d at 1287. “We generally compare the elements of the defendant’s crime to the elements of federal offenses already covered by specific Guidelines sections to ascertain which plausible analogies exist for sentencing.” Id. at 1288 (citing Nichols, 169 F.3d at 1270). In Allard (decided on the same day as Osborne), the Eighth Circuit similarly observed that, “by definition, analogous guidelines do not and need not perfectly match the defendant’s crime.” Allard, 164 F.3d at 1149 (citing United States v. Terry, 86 F.3d 353, 358 (4th Cir. 1996)). While the inquiry may still be “bounded by the elements of the offense of conviction” (John’s Brief at 23), a perfect match of elements is not necessary (or even expected). Instead, the proffered guideline need only be within the same proverbial “ballpark” as the offense of conviction.
This “ballpark” or “plausible analogy” notion actually makes a lot of sense in the ACA context. It is undisputed that “assimilated crimes, by definition, have no perfect matches among federal offenses” — otherwise they would not be assimilated under the terms of the ACA itself. (Appellant’s Brief at 32 (citing Lewis v. United States, 523 U.S. 155, 164-72, 118 S.Ct. 1135, 140 L.Ed.2d 271 (1988)).) The Background Note to § 2X5.1 explains that many offenses, particularly “assimilative offenses,” are not listed in the Statutory Index or in any of the lists of statutory provisions that follow each guideline — “Nonetheless, the specific guidelines that have been promulgated cover the type of criminal behavior that most such offenses proscribe.” § 2X5.1 cmt. background. The Sentencing Commission thereby contemplates that most assimilated offenses will actually have a “sufficiently analogous” offense guideline. In addition, this comment “suggests that the most analogous guideline is the one that covers the ‘type of criminal behavior’ of which the defendant was convicted.” Calbat, 266 F.3d at 363.
Accordingly, we now consider whether there is a “sufficiently analogous” offense guideline to Defendants’ offenses of conviction. We begin by setting forth the assault (and aggravated assault) guidelines and the related federal offenses. The Court then turns to the state statutory provisions at issue here and (in particular) the jury instructions addressing the elements of the assimilated New Jersey offense of endangering the welfare of a child. Having done so, we compare the respective elements. In the end, we conclude that Defendants’ offenses of conviction, the assault guideline, and the federal offense of simple assault are within the same proverbial “ballpark.”
The “Assault” guideline, U.S.S.G. § 2A2.3, “applies to misdemeanor assault and battery and to any felonious assault not covered by § 2A2.2 (Aggravated Assault).” § 2A2.2 cmt. background. The commentary to § 2A2.2, in turn, defines “Aggravated assault” as “a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (ie., not merely to frighten) with that weapon; (B) serious bodily injury; (C) strangling, suffocating, or attempting to strangle or suffocate; or (D) an intent to commit another felony.” § 2A2.2 cmt. n.1. “This [aggravated assault] guideline covers felonious as *377 saults that are more serious than other assaults because of the presence of an aggravating factor, i.e., serious bodily injury; the involvement of a dangerous weapon with intent to cause bodily injury; strangling, suffocating, or attempting to strangle or suffocate; or the intent to commit another felony.” § 2A2.2 cmt. background.
18 U.S.C. § 113 prohibits “[ajssaults within the special maritime and territorial jurisdiction.” Defendants here were charged with (and judgments of acquittal were granted on) assault under § 113(a)(3) (“Assault with a dangerous weapon, with intent to do bodily harm”) and § 113(a)(6) (“Assault resulting in serious bodily injury”). However, this federal provision sets forth additional assault offenses. For instance, “Assault by striking, beating, or wounding,” is punishable by a fíne or imprisonment for not more than six months (or, pursuant to a 2013 amendment, for not more than one year). § 113(a)(4); see also Pub. L. No. 113-4, § 906, 104 Stat. 478 (2013). Pursuant to § 113(a)(5), “[whoever, within the special maritime and territorial jurisdiction of the United States, is guilty of an assault shall be punished as follows:.... (5) Simple assault, by a fine under this title or imprisonment for not more than six months, or both, or, if the victim of the assault is an individual who has not attained the age of 16 years, by fine under this title or imprisonment for not more than 1 year, or both.”
The Statutory Index lists more than forty different statutory sections for these two offense guidelines. See U.S.S.G. App’x A. It specifically lists § 2A2.3 for “18 U.S.C. § 113(a)(5) (Class A misdemeanor provisions only).” Id. In other words, the assault guideline applies where the victim is under the age of sixteen — thereby triggering either a fine or imprisonment for not more than one year (or both). See, e.g., 18 U.S.C. § 3559(a)(6) (specifying that Class A misdemeanor is any offense for which maximum term of imprisonment is one year or less but more than six months); U.S.S.G. § 2X5.2 cmt. n.1 (“Do not apply this guideline to a Class A misdemeanor that has been specifically referenced in Appendix A to another Chapter Two guideline.”).
Turning to the New Jersey statutory scheme, the District Court aptly observed that “we are dealing with a less than clear statute” (A6688), which “is very unsatisfactory ... really a morass” (A6580). Specifically, N.J. Stat. Ann. § 2C:24-4a (“Endangering welfare of children”) incorporates definitions of basic concepts like abuse and neglect from various provisions of Title 9 of the New Jersey Statutes Annotated (“Children — Juvenile and Domestic Relations Courts”). See, e.g., N.J. Stat. Ann. §§ 9:6-1 (“Abuse, abandonment, cruelty and neglect of child; what constitutes”), 9:6-3 (“Cruelty and neglect of children; crime of fourth degree; remedies”), 9:6-8.21 (“Definitions”); State v. N.I., 349 N.J.Super. 299, 793 A.2d 760, 770 (2002) (“The imprecision of the Title 9 definitions incorporated into N.J.S.A. 2C:24-4a, which caused the [Criminal Law Revision] Commission to be ‘not happy’ and to recommend the statute only “[w]ith hesitancy,” has come home to roost in this case. It would, of course, be best if N.J.S.A. 2C:24-4a was self-contained with its own appropriate and precise definitions.” (emphasis omitted)). Furthermore, it appears that the same conduct may be prosecuted under § 2C:24-4a as a crime of the second degree (which happened here) or as a fourth degree crime under N.J. Stat. Ann. § 9:6-3. See, e.g., State v. D.A.V., 176 N.J. 338, 823 A.2d 34, 34 (2003) (Albin, J., concurring) (“[T]he same conduct is proscribed in the same language; however, when prosecuted pursuant to N.J.S.A. 2C:24-4, a defendant is exposed to a five-to ten-year state prison term, and when *378 prosecuted pursuant to N.J.S.A. 9:6-3, a defendant is exposed only to an eighteen-month prison term. In that respect, it appears that those provisions are unique in the New Jersey Statutes Annotated.” (emphasis omitted)).
Under these circumstances, it is understandable the parties (especially Defendants) focus on the District Court’s (rather extensive) jury instructions.
Addressing Count 1 (the conspiracy charge) of the indictment, the District Court reviewed the elements of the child endangerment offense:
The New Jersey statutes upon which endangering the welfare of a child are based are Sections 2C:24-4a, 9:6-1 and 9:6-3 of the New Jersey Statutes Annotated. Section 2C:24-4a and Section 9:6-3 criminalize the act of endangering the welfare of a child, and Section 9:6-1 provides definitions of what constitutes abuse, abandonment, cruelty and neglect of a child.
At the outset I will read the statutes to you and then I will explain how you must apply the statutes to the facts of this case by identifying the specific elements that the government must prove beyond a reasonable doubt.
Section 2C:24-4a reads, in pertinent part:
Any person having a legal duty for the care of a child or who has assumed responsibility for the care of a child who causes the child harm that would make the child an abused or neglected child ... is guilty of a crime.
Section 9:6-3 reads, in pertinent part:
Any parent, guardian or person having the care, custody or control of any child who shall ... be cruel to or neglectful of such child ... shall be deemed to be guilty of a crime....
Turning to the elements, to find Carolyn Jackson and John E. Jackson guilty of endangering the welfare of a child, the government must prove the following elements beyond a reasonable doubt:
1. That [Joshua, J, or C] was a child;
2. That the defendant knowingly caused the child harm that would make the child neglected or knowingly committed an act of cruelty against the child;
3. That the defendant knew that such conduct would cause the child harm or would inflict cruelty upon the child; and
4. That the defendant had a legal duty for the care of the child or had assumed responsibility for the care of the child.
(A6008-A6009.) The District Court then explained each element, defining the terms “child” (any person under the age of eighteen at the time of the offense), “cruelty,” and “neglect”:
The second element that the government must prove beyond a reasonable doubt is that Carolyn Jackson and John E. Jackson knowingly caused the child harm that would make the child neglected or knowingly committed an act of cruelty against the child.
Section 9:6-1 of the New Jersey Statutes Annotated includes the following applicable definitions of cruelty and neglect. As defined under Section 9:6-1, the legal definition of abuse does not apply in this case.
Cruelty consists of any of the following acts, by anyone having the custody or control of the child:
(a) Inflicting unnecessarily severe corporal punishment upon a child;
(b) Inflicting upon a child unnecessary suffering or pain, either mental or physical;
*379 (c) Habitually tormenting, vexing or afflicting a child;
(d) Any act of omission or commission whereby unnecessary pain and suffering, whether mental or physical, is caused or permitted to be inflicted on a child; or (e) Exposing a child to unnecessary hardship, fatigue or mental or physical strains that may tend to injure the health or physical well-being of such child.
Neglect consists in any of the following acts, by anyone having the custody or control of the child:
(a) Failing to provide proper and sufficient food, clothing, maintenance ... medical attendance or surgical treatment ... or
(b) Failure to do or permit to be done any act necessary for the child’s physical well-being.
In New Jersey, the use of corporal punishment is not necessarily unlawful. The law prohibits the infliction of unnecessarily severe corporal punishment; however, as a general matter, a parent may inflict moderate correction such as is reasonable under the circumstances of the case. A parent may not inflict corporal punishment that is cruel, as I have just defined for you.
(A6010-A6011.) The District Court explored what is meant by acting “knowingly” (e.g., “A person acts knowingly with respect to the nature of his or her conduct or the attendant circumstances if he or she is aware that the conduct is of that nature or that such circumstances exist or the person is aware of a high probability of their existence. A person acts knowingly with respect to a result of the conduct if he or she is aware that it is practically certain that the conduct will cause a result” (A6011)). It explained how Defendants could be found guilty for omissions or the failure to act.. The jury was told that a failure to act or an omission can be the basis for criminal liability if the government proves beyond a reasonable doubt that the defendant had a legal duty to act and failed or omitted to perform that legal duty with knowledge that this failure was practically certain to cause harm. Additionally, the District Court instructed the jury that the government must prove beyond a reasonable doubt that each defendant had a legal duty, or assumed responsibility, for the care of Joshua, J, or C. Noting that these concepts encompass adoptive and foster parents, the District Court stated that “[a] person who has assumed responsibility for the care of the child includes any person who assumes a general and ongoing responsibility for the child and who establishes a continuing or regular supervisory or caretaker relationship with the child.” (A6012.)
The District Court, after summarizing the factual allegations for each substantive count (Counts 2 through 18), expressly incorporated its Count 1 instructions in each count. For the first substantive charge (Count 2), the written instructions provided a little more detail regarding the requisite elements:
I have previously instructed you regarding the Assimilative Crimes Act and Endangering the Welfare of a Child. There are two elements that the government must prove in a violation of the Assimilative Crimes Act:
1. First, that the defendants endangered the welfare of a child; and
2. Second, that the offense occurred within the special maritime and territorial jurisdiction of the United States.
Additionally, to prove a violation of endangering the welfare of a child in violation of New Jersey law, the government must prove:
1. That [Joshua] was a child.
*380 2. That the defendant knowingly-caused the child harm that would make the child neglected or a child upon whom cruelty has been inflicted;
3. That the defendant knew that such conduct would cause the child harm or would inflict cruelty upon the child; and '
4. That the defendant had a legal duty for the care of the child or had assumed responsibility for the care of the child. .
Because I already gave you detailed instructions regarding this offense in Count One, I will not repeat them. The same instructions apply to this count of the Superseding Indictment.
(A6019-A6020.)
The jury was also given a written “Good Faith Defense” instruction, which stated, among other things that, “[i]f you find that Carolyn Jackson and John E. Jackson acted in ‘good faith,’ as that term is defined below, that would be a complete defense to this charge, because good faith on the part of Carolyn Jackson or John E. Jackson would be inconsistent with his or her acting knowingly.” (A6035.) According to the District Court:
A defendant acts in “good faith” when he or she did not know that his or her acts or omissions were practically certain to cause harm to a child, even though that knowledge turns out to be inaccurate or incorrect. Thus, in this case if Carolyn Jackson or John E. Jackson made an honest mistake or had an honest misunderstanding about whether his or her acts or omissions were practically certain to cause harm to a child then he or she did not act knowingly. A belief need not be- objectively reasonable to be held in good faith; nevertheless, you may consider whether Carolyn Jackson or John E. Jackson’s stated belief that his or her acts or omissions were not practically certain to cause harm to a child was reasonable as a factor in deciding whether the belief was honestly or genuinely held.
(Id.) Defendants did not have the burden of proving good faith. The written instructions summarized the defenses offered by Carolyn and John: (1) the conduct was done in good faith and not knowing that Defendants’ acts or omissions were practically certain to cause Joshua, J, or C harm (i.e., they did not knowingly harm the three children): (2) they merely acted negligently or accidentally or otherwise failed to act through ignorance or mistake; (3) they did not inflict unnecessarily severe corporal punishment; and (4) Defendants did not enter into a criminal conspiracy to endanger the welfare of Joshua, J, or C.
The written instructions for Counts 2, 4, 7, 8, 9, 10, 11, and 13 stated that Defendants allegedly caused harm to the respective child, “and made [him or her] a neglected child, and a child upon whom cruelty has been inflicted, as I have defined for you previously, in violation of Title 18, United States Code, Sections 13 and 2, and N.J.S.A. Section 2C:24-4a.” (A6019, A6022, A6025-A6026, A6027, A6028-A6029, A6031.) For Counts 3, 5, 6, 9, and 12, the District Court’s instructions did not mention the concept of neglect. Instead, the District Court referenced allegations that Defendants caused harm to the respective child and made him or her “a child upon whom cruelty has been inflicted, as I have defined for you previously, in violation of Title 18, United States Code, Sections 13 and 2, and N.J.S.A. Section 2C:24-4a.” (A6021, A6023-A6024, A6027, A6030.) In its oral instructions, the District Court stated the following:
For Counts Two, Four, Seven, Eight, Ten, Eleven, and Thirteen, you may find a defendant guilty of endangering the welfare of a child based on either ne- *381 gleet or cruelty, but all twelve of you must unanimously find beyond a reasonable doubt that defendant knowingly caused harm to a child by either neglecting a child, as I have defined previously, or by inflicting cruelty upon a child, as I have defined it previously, or both. The government, however, does not have to prove both contentions for those Counts Two, Four, Seven, Eight, Ten, Eleven and Thirteen, and you do not have to unanimously agree that the defendant knowingly caused harm by neglecting a child and inflicting cruelty upon a child for those counts.
(A5901.)
We acknowledge that there are some differences between the elements of Defendants’ offenses of conviction, on the one hand, and the assault guideline and the various federal offenses implicated by this guideline (especially the offense of simple assault), on the other hand. Specifically, the expansive elements of child endangerment encompass a wide range of actions— and inaction. For instance, the jury was told that cruelty consists of not only unnecessarily severe corporal punishment and unnecessary physical suffering or pain but also unnecessary mental suffering or pain as well as habitual tormenting, vexing, or afflicting. Even the government “argued there was no sufficiently analogous offense Guideline for the crimes of omission.” (Appellant’s Brief at 25.) The government asserts that, while the jury could find Defendants guilty on the omission charges because they either inflicted cruelty or neglected the child, the jury was instructed that, to find them guilty on the purported crimes of commission (with the exception of Count 10), it had to find that they inflicted cruelty. We observe that the jury instructions for Counts 2, 4, 7, 8, 9,10, 11, and 13, specifically referred to both neglect and cruelty, and the District Court explained that the jury could find Defendants guilty on these charges based on a finding of either neglect or cruelty. In contrast, the instructions for Counts 3, 5, 6, 9, and 12 exclusively referenced the concept of cruelty. Nevertheless, the District Court also defined “cruelty” as including “[a]ny act of omission ... whereby unnecessary pain and suffering, whether mental or physical, is caused or permitted to be inflicted on a child” and “[ejxposing a child to unnecessary hardship, fatigue or mental or physical strains that may tend to injure the health or physical well-being of such child.” (A6010.)
Yet the jury, at least with respect to the cruelty charges, still had to find that the government established beyond a reasonable doubt that Defendants “knowingly committed an act of cruelty against the child.” (A6009.) If it is fair to say that the New Jersey offense at issue here incorporates a number of expansive components, the same could be said with respect to the federal assault scheme. The federal simple assault provision encompasses common law battery — the unlawful application of force to the person of another, including offensive touching. See, e.g., United States v. Delis, 558 F.3d 177, 177-84 (2d Cir. 2009). It also includes common law assault, defined as an attempted battery or the deliberate infliction upon another of the reasonable fear of physical injury. Id In addition, the jury instructions did not require the jury to find the degree of harm suffered by the children. The assault guideline as well as the federal offense of simple assault, in turn, do not mandate proof of any sort of bodily injury or even actual physical contact.[6] As Carolyn explains, assault “re *382 quires nothing more than ... placing of the victim in reasonable apprehension of physical harm,” and “[n]o injury is required.” (Carolyn’s Brief at 28.) “When the victim of an assault is under 16 years old, an assault is punishable by imprisonment for up to one year.” (Id. (citing § 113(a)(5)).) We further note that the jury generally rejected Defendants’ “Good Faith Defense,” determining instead that they did not make “an honest mistake or had an honest misunderstanding about whether his or her acts or omissions were practically certain to cause harm to a child.” (A6035.)
In turn, it is only to be expected that the offense of conviction may include more expansive elements than the federal offense or additional elements missing from the federal counterpart. After all, “ ‘analogy does not mean identity. It implies difference.’ ” Langley, 919 F.2d at 931 (quoting Sturm, 10 F.2d at 11); see also, e.g., Rakes, 510 F.3d at 1287 (stating that court first had to ask what analogous provisions were within “the ballpark”); Allard, 164 F.3d at 1149 (“[B]y definition, analogous guidelines do not and need not perfectly match the defendant’s crime.” (citing Terry, 86 F.3d at 358)). Carolyn points out that, when corporal punishment by a parent is the basis of a child endangerment charge, the prosecution must prove that the punishment was unnecessarily severe or caused unnecessary pain. According to her, “[t]here is no such requirement under the federal assault statute which does not address corporal punishment employed by parents.” (Carolyn’s Brief at 34.) She further observes that, unlike the federal scheme, the New Jersey provision requires that the defendant either have a legal duty for the.care of the child or have assumed responsibility for the child. Yet a jury finding that a defendant, for instance, had assumed responsibility for a child and then inflicted unnecessarily severe corporal punishment on this child by (to give two examples offered by Carolyn herself) “washing] her child’s mouth out with soap” or “forcing the ingestion of hot sauce” (id. at 35 & n.32 (citations omitted)), would necessarily (if implicitly) find that the defendant thereby committed simple assault, i.e., an offensive touching. In fact, Carolyn essentially admits this overlap when she claims that “‘parents commit this [assault] offense every day of the week in every state in the union.”[7] (Carolyn’s Brief at 28.)
*383 Defendants and the District Court rely on a Fifth Circuit non-precedential decision: United States v. Loften, 465 Fed.Appx. 294 (5th Cir. 2010) (per curiam). In this case, the defendant was convicted under the ACA for violating a Texas criminal provision by causing injury to a child. H. at 295. In addition to claiming that the ACA did not incorporate this state offense because the federal simple assault provision governed his conduct, the defendant argued that, among other things, the district court erred by failing to apply the “most analogous” offense guideline, i.e., the assault guideline. Id. He did not raise these arguments below, and the Fifth Circuit concluded that he failed to satisfy the plain error standard of review:
However, the district court was obligated to apply the Sentencing Guidelines in Loften’s case and erred by failing to consider whether an analogous Guideline existed that could be used in determining Loften’s sentencing range. See [Cal-bat, 266 F.3d at 362], That error did not affect Loften’s substantial rights. A review of the applicable statutes reveals no analogous Guideline.
Id. at 295. The government argued in Lof-ten that, under the applicable “elements-based” approach, the elements of the federal assault offenses implicated by the assault guideline were significantly different from the elements of the offense of conviction (i.e., § 113(a)(4) does not require that the victim be a child under the age of fourteen, the federal simple assault provision does not require that the assault cause bodily injury (a key element of the Texas offense), and § 113(a)(7) only punishes assaults that result in substantial bodily injury to a child under the age of sixteen). As John puts it, “[i]t is unsettling that the government calls the position it took in Loften ‘mistaken,’ when it took that position to secure a more severe sentence for the defendant, but now takes precisely the opposite position here, in an effort to secure a draconian guideline range and sentence.” (John’s Brief at 28-29.)
Nevertheless, we do not place much weight on a non-precedential ruling from another circuit concluding, without any real discussion, that the district court’s failure to consider whether there was an analogous offense guideline did not affect the defendant’s substantial rights because a review of the applicable statutes supposedly revealed no such guidelines. Defendants point to nothing binding the government in this case — a case implicating assimilated New Jersey law in which the Solicitor General granted personal approval to appeal — to another United States Attorney’s Office’s position with respect to a conviction under assimilated Texas law. We further note that the Texas statutory provision addressed in Loften differs from the New Jersey offense at issue here. Specifically, the Texas provision actually requires proof of bodily injury.[8]
*384 The government argues that the District Court’s various reasons for rejecting the “assault Guidelines” do not withstand scrutiny. “For example, the Court protested that: the jury was not asked to make the findings contained in the assault Guidelines; it would not be ‘justice’ to allow the Court to make those findings under the lower [preponderance of the evidence] standard of proof that governs all federal sentencings; and it would be unfair to allow the Government to charge one statute and seek punishment for another.” (Appellant’s Brief at 37-38 (citing A6468-A6472, A6477, A6484, A6491, A6558, A6573-A6578, A6584-A6590, A6703).) Carolyn offers an extensive explanation for why the use of the Guidelines in this case would purportedly require impermissible judicial fact-finding. She insists that the sentencing court “cannot find facts which are elements of the crime because the Fifth and Sixth Amendment give individuals ‘a right to demand that each and every element of the alleged crime be submitted to a jury and proved beyond a reasonable doubt before sentence is imposed.’ ” (Carolyn’s Brief at 37 (quoting United States v. Grier, 475 F.3d 556, 562 (3d Cir. 2007) (en banc)).) While the sentencing court could decide whether the offense involved, for example, an abuse of trust because such matters have not traditionally been considered elements of a crime, it purportedly cannot find facts that have traditionally been seen as elements of assault offenses, such as the severity of an injury or whether a dangerous weapon was used. “Applying that reasoning to this case, the analogous offense cannot be one for which the jury has not found a determinative fact. The defendant cannot be tried fpr a charge for which no significant injury is required and then be sentenced as if a finding of such harm had been made.... A defendant cannot be tried for one crime and sentenced for another.” (Id. at 39 (citing United States v. Lewis, 802 F.3d 449, 454-55 (3d Cir. 2015))). According to Carolyn (and the District Court itself), it was the government’s own conduct in this case that precludes the application of the Guidelines: “The government rejected a jury charge that would define an abused or neglected child as suffering the degree of harm that its arguing I should say happened and that the child indeed did suffer. And instead, asking me to make that kind of finding, as well as asking me to make that finding on a lower standard of proof. That is tough to swallow.”[9] (A6576.)
*385 However, Defendants were tried, convicted, and should be sentenced for child endangerment (and conspiracy to commit child endangerment) — not for assault. It would have been inappropriate for the District Court to charge the jury on offenses that were not before it. It is § 2X5.1 that then requires the sentencing court to consider, whenever the offense of conviction is a felony for which no offense guideline has been promulgated, whether there are any “sufficiently analogous” offense guidelines, and, if so, apply the guideline that is “most analogous” to the crime of conviction. No fact-finding is required to select the offense guideline because we have determined that the “sufficiently analogous” guideline inquiry merely implicates a comparison of legal elements — a question of law reviewed under a plenary standard of review. In turn, “by definition, analogous guidelines do not and need not perfectly match the defendant’s crime.” Allard, 164 F.3d at 1149 (citing Terry, 86 F.3d at 358); see also, e.g., Rakes, 510 F.3d at 1287 (noting that court first had to ask what provisions were within ballpark); Langley, 919 F.2d at 931 (observing that analogy implies difference). Defendants, for their part, do not cite to any case law calling into question the constitutionality of § 2X5.1 itself, and a district court cannot refuse to apply the Guidelines and calculate an advisory sentencing range because of its disagreement with otherwise applicable Guidelines. United States v. Napolitan, 762 F.3d 297, 312-313 (3d Cir. 2014); United States v. Gonzalez, 462 F.3d 754, 755 (7th Cir. 2006). In fact, the assault guideline would apply even if the jury had actually found that Defendants were not guilty of simple assault under the federal assault provision.[10] See, e.g., Rakes, 510 F.3d at 1290 (“Finally, Mr. Rakes contends that it was improper for the district court to sentence him under guideline 2A6.1, threatening or harassing communications, when the court granted him an acquittal on mailing a threatening communication, 18 U.S.C. § 876, which falls squarely within guideline 2A6.1. We have, however, rejected this precise argument in Nichols.... We affirmed Mr. Nichols’s sentence under the first degree murder guideline, finding that it was the most analogous, and his acquittal of murder did not affect our ‘most *386 analogous guideline’ inquiry.” (citing Nichols, 169 F.3d at 1270-76)). It also bears repeating yet again that proof of physical injury is not necessary to trigger application of the assault guideline or for a simple assault conviction under federal law (and that these provisions likewise do not require use of a weapon).[11]
The District Court (as well as Carolyn) have devoted a great deal of attention to the nature of what is an admittedly complicated state statutory scheme. Specifically, § 2C:24-4a incorporates definitions from Title 9 of the New Jersey Statutes Annotated (“Children — Juvenile and Domestic Relations Courts”). According to Carolyn, Title 9 — which has no federal analog— implicates the state’s unique parens patrie responsibility to protect children, the parent-child relationship, and a parent’s right to use reasonable discipline (as opposed to unnecessarily severe corporal punishment or unnecessary pain or suffering). The District Court observed that Title 9 “is there to protect the children” and to provide a constitutionally appropriate mechanism for state family court judges to decide whether these children should be taken from their parents, whether they should eventually be reunified, and whether the parental relationship should be terminated:
And this is all very serious. And this is all procedurally taken care of. And this is all about what Title 9 does for the citizens of New Jersey. And why? Because of what the courts have in the State of New Jersey, not in the federal government, when is parens patrie jurisdiction. We don’t talk about it. No one’s briefed it for me. Maybe you all know I know it.
But, I exercised parens patrie jurisdiction as a family court judge and any of you who have had a family court matter in the State of New Jersey, including custody matters, private litigation, divorce custody, adoption, you all know that it’s the parens patrie jurisdiction of the family part. And sometimes well, it’s part of Chancery.
That gives the authority to the judge to say what time you have to pick up your kids, to say where your child lives, to be as intrusive as one needs to be to protect the interests of the children, to move property around, to seize property if, in fact, somebody is trying to divest because it could hurt the family’s interest, to pass property through probate. All of this has to do with the parens patrie jurisdiction if the interests of a child are involved.
So, is that federal? Does the federal government have anything to say where that’s concerned? I really do not believe it does. And if somebody wants to make an argument, I will give you time to do it. But, I’m saying it would be a strained and difficult argument to make as some of the enhancements were.
Let the State of New Jersey have its parens patrie jurisdiction. And let us honor and respect it by seeing what we can do with this statute that incorporates that parens patrie jurisdiction in the rubric and the meaning of the definitions and the state crime that we are trying to move because it arises out of the parens patrie jurisdiction.
(A6581-A6582.) In short, “this statute doesn’t really fit with assault because it is balancing the rights of parents to disci *387 pline their kids with the outcome of the execution of that right to discipline their kids.” (A658B.) The District Court believed that it simply could not fit a proverbial square peg into a round hole:
So, this case is about parental discipline, the choices of discipline and the findings of the jury that the choices of discipline, as identified in the various counts, amounted to either acts of cruelty as defined to them in the jury charge, or neglect that caused harm.
So, I don’t find an analogous federal statute. I don’t find that the federal government’s laws about assault cover that parental relationship or custodial or legal guardian or authority over relationship that infuses and is the basis and is the reason for the state’s statute. I find that this is fitting a square peg into a round hole.
(A6588.)
“In Osborne, [the Eighth Circuit] commented that attempting to fashion a sentence pursuant to USSG § 2X5.1 is frequently similar to attempting to determine which round hole best accommodates a square peg.” Allard, 164 F.3d at 1150. Nevertheless, § 2X5.1 still requires the sentencing court to undertake this admittedly difficult task, and the District Court committed reversible error by failing to comply with this obligation.
In any event, we find that these various observations about Title 9 and New Jersey’s parens patrie jurisdiction ultimately have little, if any, real bearing on the outcome of the “sufficiently analogous” guideline inquiry. As we have already explained, it is reasonable to expect that the offense of conviction may include an additional element missing from, or incorporate a more expansive element than, the federal offense. Based on the jury instructions given in this case, a jury finding that a defendant exceeded his or her parental rights by, for example, inflicting unnecessarily severe corporal punishment constituted an implicit finding that defendant thereby committed simple assault. Furthermore, the District Court’s discussion of Title 9 and New Jersey family court proceedings appeared rather removed from the “elements-based” inquiry — an approach that Defendants themselves ask us to adopt. By indicating that the “federal government does [not] have anything to say” here (A6582), the District Court also effectively called into question whether the child endangerment offense was properly assimilated under the ACA in the first place. However, it is undisputed that the New Jersey Legislature, by enacting § 2C:24-4a, decided that any person having a legal duty for the care of a child or who has assumed responsibility for the care of a child who causes the child harm that would make the child an abused or neglected child is guilty of a crime of the second degree. In turn, the offenses at issue here — because they occurred on a military installation under the special jurisdiction of the federal government — were assimilated under the ACA. Even though the state criminal provision implicates the state’s interest in protecting children from harm while preserving the parent-child relationship (and incorporates aspects of the state’s “Children-Juvenile and Domestic Relations Courts” scheme), this is still a criminal prosecution in federal court under an assimilated state criminal statutory provision — and not, to give just one example, an action before a state family judge to terminate Defendants’ parental rights. In fact, a separate Chancery Division proceeding was filed by the appropriate New Jersey authorities, which has resulted in the termination of Defendants’ parental *388 rights vis-á-vis both J and C.[12] See, e.g., C.J., 2014 WL 3881311, at *39-*52.
Finally, we believe that the existing case law indicates that the assault guideline is “sufficiently analogous” to Defendants’ offenses of conviction.
After all, the threshold “sufficiently analogous” guideline inquiry is satisfied merely if the analogous provisions are, inter alia, “within the ballpark,” Rakes, 510 F.3d at 1287, or “some plausible analogfy]” exists between the elements of the defendant’s crime and the elements of federal offenses covered by the existing offense guideline, id. at 1288. The Sentencing Commission also indicates that most assimilated offenses will have a “sufficiently analogous” offense guideline. See § 2X5.1 cmt. background (“Nonetheless, the specific guidelines that have been promulgated cover the type of criminal behavior that most such offenses proscribe.”). Concluding that the ACA did not assimilate a state first-degree murder child victim provision, the Supreme Court reserved judgment on the question of whether state child abuse statutes may be assimilated given the existence of a federal assault statute: “And, without expressing any view on the merits of lower court cases that have assimilated state child abuse statutes despite the presence of a federal assault law, § 113, see, e.g., United States v. Brown, [608 F.2d 551, 553-54 (5th Cir. 1979) ]; United States v. Fesler, 781 F.2d 384, 390-391 (C.A.5 1986), we note that the federal assault prohibition is less comprehensive than the federal murder statute, and the relevant statutory relationships are less direct than those at issue here.” Lewis, 523 U.S. at 171-72, 118 S.Ct. 1135.
In a companion case to its Osborne decision, the Eighth Circuit determined that the involuntary manslaughter guideline was “sufficiently analogous” to the assimilated state offense of vehicular battery— even though involuntary manslaughter requires the death of the victim while the battery charge only requires serious bodily injury. Allard, 164 F.3d at 1149. Pointing out that analogous guidelines, by definition, do not and need not perfectly match the defendant’s crime, the Allard court “cannot say as a matter of law that the difference between death and serious bodily injury makes involuntary manslaughter insufficiently analogous to vehicular battery.” Id. (observing that necessary line drawing in determining whether victim’s injury is serious enough is better left to district court to decide as part of “most analogous” guideline analysis); see also, e.g., Calbat, 266 F.3d at 363-64 (rejecting defendant’s argument that involuntary manslaughter guideline was “most analogous” offense guideline to offense of intoxication assault); Osborne, 164 F.3d at 440 (“As for Osborne’s argument that involuntary manslaughter is more analogous to vehicular battery, we first observe that death did not result in this case. More *389 importantly, we give due deference to the district court’s choice of the most analogous guideline and cannot say the. aggravated assault guideline was inappropriately applied in this case”). Yet, if a homicide guideline could be considered to be “sufficiently analogous” to an offense that does not even require proof of death, we see no reason why the assault guideline should not apply here.[13]
B. Refusal to Find Facts
The District Court committed reversible error by refusing to engage in the requisite fact-finding pursuant to the applicable preponderance of the evidence standard.
It is well established that “the constitutional rights to a jury trial and proof beyond a reasonable doubt attach only to facts that ‘constitute the elements of a crime,’ which are those facts that increase the maximum [or minimum] statutory punishment to which the defendant is exposed.” United States v. Smith, 751 F.3d 107, 117 (3d Cir. 2014) (quoting Grier, 475 F.3d at 562). In contrast, “facts that only enhance sentences within the range allowed by the jury’s verdict (or guilty plea) need not be charged in an indictment or proven beyond a reasonable doubt.” United States v. Tidwell, 521 F.3d 236, 250 n.9 (3d Cir. 2008) (citing Grier); see also, e.g., Smith, 751 F.3d at 117 (“Facts relevant to the application of various Guidelines provisions, which are advisory only, do not implicate these rights.” (citing Grier, 475 F.3d at 562)). As we have already explained, Defendants were charged, convicted, and should be sentenced for child endangerment (and conspiracy to commit child endangerment). By finding Defendants guilty of crimes of the second degree, the jury triggered a maximum sentence for each count of conviction of ten years’ imprisonment (together with a minimum term of imprisonment of five years). See N.J. Stat. Ann. § 2C:43-6a(2). New Jersey law permits consecutive sentencing, meaning that the absolute maximum term of imprisonment at issue here is 120 years for Carolyn and 100 years for John. See, e.g. N.J. Stat. Ann. § 2C:44-5. Facts like the severity of the injury or the use of a weapon do not affect the maximum and minimum sentences established by statute. In fact, neither the degree of harm suffered by the victim nor the use of a weapon constitute an element of the offenses of conviction — or the federal crime of simple assault. While “Booker afforded judges broad discretion to enter appropriate sentences in consideration of § 3553(a) factors,” it “is not within the sentencing judge’s discretion to diverge from applying the preponderance-of-the-evidenee standard in the initial sentencing calculation at step one [i.e., calculation of the advisory Guidelines range.]” United States v. Ali, 508 F.3d 136, 155 (3d Cir. 2007) (footnote omitted). Likewise, a sentencing court cannot refuse to apply the Guidelines and calculate an advisory sentencing range because of its disagreement with otherwise applicable Guidelines. See, e.g., Napolitan, 762 F.3d at 312-13; Gonzalez, 462 F.3d at 755.
Having identified the offense guideline applicable to the offense of con *390 viction under the Guidelines, the sentencing court must then “determine the applicable guideline range in accordance with § 1B1.3 (Relevant Conduct).” U.S.S.G. § 1B1.2(b); see also, e.g„ U.S.S.G. § 1B1.1(2) (directing court to determine base offense level and apply any appropriate specific offense characteristics, cross-references, and special instructions contained in applicable offense guideline). As John explains, “[i]f a guideline is applicable, the second step involves applying enhancements and adjustments based on, inter alia, relevant conduct.” (John’s Brief at 14 (citing § 1B1.2(b)).) In other words, the court must “apply ‘any applicable specific offense characteristics (under that guideline), and any other applicable sentencing factors pursuant to the relevant conduct definition in § 1B1.3.’ ” (Id. at 16 (quoting U.S.S.G. § 1B1.2(b) cmt. n.2).) Unlike the “offense of conviction,” “ ‘Relevant Conduct’ includes other, uncharged and related activities.” United States v. Pressler, 256 F.3d 144, 157 n.7 (3d Cir. 2001). This includes facts that might have formed the basis of uncharged offenses as well as charges on which the defendant was acquitted. See, e.g., United States v. Ciavarella, 716 F.3d 705, 735-36 (3d Cir. 2013) (“But ‘a jury’s verdict of acquittal does not prevent the sentencing court from considering conduct underlying the acquitted charge so long as that conduct has been proved by a preponderance of the evidence.’ ” (quoting United States v. Watts, 519 U.S. 148, 157, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997))); Grier, 475 F.3d at 568 (“[Facts relevant to the application of the Guidelines — whether or not they constitute a separate offense] do not constitute ‘elements’ of a ‘crime’ under the rationale of Apprendi and do not implicate the rights to a jury trial and proof beyond a reasonable doubt.” (quoting Apprendi v. New Jersey, 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000))). But see United States v. Berry, 553 F.3d 273, 281 n.6 (3d Cir. 2009) (questioning whether Watts is in tension with Apprendi line of cases). In this case, the assault guideline’s cross-reference directs the sentencing court to apply the aggravated assault guideline “[i]f the conduct constituted aggravated assault.” U.S.S.G. § 2A2.3(c). In turn, the Guidelines set forth various enhancements for, inter alia, the level of planning, the degree of injury, the victim’s vulnerability, the use of dangerous weapons, the defendant’s abuse of trust, and obstruction of justice. See U.S.S.G. §§ 2A2.2(b), 2A2.3(b), 3A1.1(b)(1), 3B1.3, 3C1.1.
The District Court committed reversible error by refusing to make the requisite findings of fact with respect to both the advisory Guidelines calculation as well as the application of the § 3553(a) factors. Refusing to find aggravating facts under the applicable preponderance standard, it repeatedly indicated that it would not make any factual findings that were not necessarily found by the jury, or “ ‘shown beyond a reasonable doubt” (A6701; see also A6578, 6715). In particular, the District Court (having determined that there is no “sufficiently analogous” offense guideline) failed to make findings of fact relevant to the various sentencing enhancements as well as the assault guideline’s cross-reference to the offense guideline for aggravated assault. John acknowledges that, if we conclude that there is a “sufficiently analogous” offense guideline, we “should remand the case to permit the [District Court] to calculate the guidelines range.” (John’s Brief at 30.) Because we conclude that the assault guideline constitutes a “sufficiently analogous” offense guideline, the District Court must now make the requisite findings of fact (under a preponderance of the evidence standard) in order to calcu *391 late this range (which includes deciding whether the aggravated assault guideline applies pursuant to the cross-reference as well as applying any relevant sentencing enhancements).
C. The ACA, Sentencing Guidelines, and State Law
We agree with the government that — while, “following Booker, a sentencing court likely can consider what a state defendant would receive if he had been prosecuted in state court” (Appellant’s Brief at 52) — the District Court simply went too far in this case by focusing on state sentencing practices to the exclusion of basic federal sentencing principles. Instead of acting as a federal court applying the well-established federal sentencing scheme, the District Court essentially acted as a state court applying the various intricate aspects of New Jersey’s sentencing practices.
18 U.S.C. § 13(a) subjects the defendant to “a like punishment.” It is undisputed that state law thereby sets the minimum and maximum punishment that may be imposed. Defendants do not claim that the Guidelines-based sentences sought by the government exceed this limitation.
Carolyn discusses New Jersey sentencing principles at some length. She contends that the District Court “recognized that, in order to give effect to the fundamental principle of the ACA that a crime under that statute is ‘punishable only in the way and to the extent that it would have been punishable’ if committed on non-federal property, it was necessary to consider the actual time that the defendant will serve.” (Carolyn’s Brief at 14-15 (quoting United States v. Press Publ’g Co., 219 U.S. 1, 10, 31 S.Ct. 212, 55 L.Ed. 65 (1911) (emphasis added)).) According to Carolyn, the District Court appropriately recognized that application of the Guidelines would not satisfy the ACA’s “like punishment” requirement. According to the New Jersey Appellate Division, “ ‘the basic sentencing issue is always the real time defendant must serve, and we have always recognized that real time is the realistic and practical measure of the punishment imposed.’ ” State v. Cooper, 402 N.J.Super. 110, 952 A.2d 1122, 1126 (2008) (citation omitted). “The ‘real sentence’ is found in the State Parole Board Eligibility Tables which provide ‘a fair and practical indicator of the likely actual custodial time for those defendants who get full credit for good time, work time, and minimum custody time.’ ” (Carolyn’s Brief at 15 (footnote omitted) (quoting Pressler & Veniero, Current N.J. Court Rules, Comment R. 3:21-4[10] (Gann 2017)).) Carolyn explains that a defendant sentenced to a five-year term of imprisonment under New Jersey law would actually .serve approximately 12 months (while, if he or she was sentenced to the same term under federal law, the defendant would serve approximately 53 months).[14] In addition, the state trial court may sentence a defendant to a term appropriate to a crime one degree lower if it is clearly convinced that the mitigating factors substantially outweigh the aggravating factors and the interest of justice so demand (which in this case would result in a term of between three and five years). N.J. Stat. Ann. §§ 2C:43-6a(3), 2C:44-1f(2). Similarly, there is a presumption of impris *392 onment for a person convicted of a second degree offense, but it may be overcome when the state sentencing judge finds imprisonment would constitute a serious injustice overriding the need to deter others. N.J. Stat. Ann. § 2C:44-1d. While acknowledging that a federal court need not follow every last nuance of state sentencing practices, Carolyn argues that Judge Hayden (a former state court judge) properly attempted to replicate a “real time” sentence.
However, Congress made it clear in 1990 that ACA defendants “shall be sentenced in accordance” with § 3553 and the Guidelines. See Pub. L. No. 101-647, § 1602, 104 Stat. 478 (1990). We have explained that “state law sets the minimum and maximum punishment while the federal sentencing guidelines should be used to determine the actual sentence within that range.” See, e.g., United States v. Queens-borough, 227 F.3d 149, 160 (3d Cir. 2000) (citing United States v. Pierce, 75 F.3d 173, 176 (4th Cir. 1996); United States v. Marmolejo, 915 F.2d 981, 984 (5th Cir. 1990); United States v. Garcia, 893 F.2d 250, 254 (10th Cir. 1989)), abrogation on other grounds recognized by United States v. Dahmen, 675 F.3d 244 (3d Cir. 2012). In addition, § 3553(a)(6) directs district courts to consider the need to avoid unwarranted federal sentencing disparities. See, e.g., United States v. Begin, 696 F.3d 405, 412-14 (3d Cir. 2012). The ACA does not assimilate a state sentencing policy or practice that conflicts with federal sentencing policies. See, e.g., United States v. Coleman, 38 F.3d 856, 861 (7th Cir. 1994) (“Coleman argues that with good time under Illinois law he would have had to serve a maximum of 7½ years (1/2 of the maximum 15 year penalty allowed). However, while the Assimilative Crimes Act states that punishment should be ‘like’ that of the state punishment, the federal government does not have to adopt the same provisions for computing when a sentence is satisfied.” (citing United States v. Norquay, 905 F.2d 1157, 1162 (8th Cir. 1990); United States v. Vaughan, 682 F.2d 290, 294-95 (2d Cir. 1982))); Norquay, 905 F.2d at 1163 (‘We are similarly persuaded that application of state law regarding good time credits and consecutive versus concurrent sentencing to a federal offender under the Major Crimes Act would be disruptive to the federal prison system.”); United States v. Smith, 574 F.2d 988, 992 (9th Cir. 1978) (rejecting district court’s application of three-year minimum term under state law before prisoner could be eligible for parole because ACA “does not further require adherence to state policy with reference to parole eligibility,” prisoner is federal prisoner subject to federal correctional policies, and it would be disruptive to have two classes of prisoners subject to different rules).[15]
According to Carolyn, “[federal parole policy is not implicated here, and it is not contended that New Jersey parole policy should be adopted by the federal prison system.” (Carolyn’s Brief at 47.) But insofar as Carolyn and the District Court have *393 indicated that the concept of “real time”— i.e., the parole eligibility date under state law — should control, this is what in essence occurred here. After all, there is no real difference between a sentencing court directing the Bureau of Prisons to apply state parole policies and a court simply adopting these policies from the outset by imposing a term of imprisonment based on the putative date that the defendant would be eligible for release if prosecuted, convicted, and sentenced in the state court system.
D. Substantive Unreasonableness[16]
Finally, we consider the substantive reasonableness of the sentences imposed by the District Court. According to the government, “no reasonable sentencing court would have imposed such lenient sentences on parents who beat, starved, and neglected their young and defenseless adopted children over a five-year period, contributing to the death of one, almost killing another twice, and causing permanent damage to the survivors.” (Appellant’s Brief at 54 (emphasis omitted).) The government may go too far in its characterization of Defendants’ conduct and the injuries they inflicted on their children. In addition, we do not suggest that the District Court must sentence Defendants to the terms of imprisonment sought by the government (235 months for Carolyn and 188 months for John). Nevertheless, we do conclude that “no reasonable sentencing court would have imposed [a sentence of 24 months’ imprisonment and three years of supervised release for Carolyn and a sentence of two years of probation, a fine, and community service for John] for the reasons the district court provided.” Tomko, 562 F.3d at 568. Simply put, more than two years of incarceration and probation is required to satisfy the purposes of sentencing established by Congress.
The third step of the three-step sentencing process requires the district court to exercise its discretion by considering the relevant § 3553(a) sentencing factors. See, e.g., id at 567. These factors are:
(1) the nature and circumstances of the offense and the history and characteristics of the defendant;
(2) the need for the sentence imposed—
(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
(3) the kinds of sentences available;
(4) the kinds of sentence and the sentencing range established for—
(A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines ....;
(5) any pertinent policy statement—
(A) issued by the Sentencing Commission. .'..;
(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
(7) the need to provide restitution to any victims of the offense.
*394 § 3553(a). Under this statutory provision, the court must impose a sentence that is “sufficient, but not greater than necessary, to comply with the purposes of [sentencing].” Id. “This requirement is often referred to as ‘the parsimony provision,’ and the Supreme Court has referred to it as the ‘overarching instruction’ of 18 U.S.C. § 3553(a).” United States v. Olhovsky, 562 F.3d 530, 548-49 (3d Cir. 2009) (quoting Kimbrough v. United States, 552 U.S. 85, 101, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007)). It is well established that the sentencing judge occupies a “ ‘superior position to find facts and judge their import under § 3553(a) in the individual case,’” and “ ‘gain[ ] insights not conveyed by the record.’ ” Tomko, 562 F.3d at 560-61 (quoting Gall v. United States, 552 U.S. 38, 51-52, 128 S.Ct. 586, 169 L.Ed.2d 445 (2007)). However, this does not make us a mere rubber stamp. A sentence must still be reversed if “no reasonable sentencing court would have imposed the same sentence on that particular defendant for the reasons the district court provided.” M. at 568. This standard is “not an exercise in [appellate] self-abnegation.” Id. at 575.
Our preferred course of action upon finding procedural error is to remand the case for resentencing, without considering the substantive reasonableness of the sentence imposed. See, e.g., United States v. Merced, 603 F.3d 203, 214 (3d Cir. 2010). Nevertheless, “procedural problems may lead to substantive problems, so there are times when a discussion of procedural error will necessarily raise questions about the substantive reasonableness of a sentence.” United States v. Levinson, 543 F.3d 190, 195 (3d Cir. 2008) (citing United States v. Goff, 501 F.3d 250, 256 (3d Cir. 2007)). This is one of those times.
The government asserts that proper consideration of the facts and the relevant Guidelines would have resulted in a sentencing range for Defendants of 210 to 262 months (according to the Probation Office) or 292 to 365 months (as calculated by the government). See, e.g., § 3553(a)(4)(A) (referring to sentencing range for “the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines”). While the District Court never undertook the proper Guidelines calculation, it appears undisputed that the advisory range under the Guidelines would have been substantially higher than the sentences that were imposed here. In essence, probation for John and 24 months’ imprisonment for Carolyn represented enormous downward variances, which require correspondingly robust explanations for why such lenience was warranted. See, e.g., Gall, 552 U.S. at 50, 128 S.Ct. 586 (“We find it uncontroversial that a major departure should be supported by a more significant justification than a minor one.”); Merced, 603 F.3d at 216 (“The extent of the explanation we require [to allow us to conduct the substantive reasonableness review] may turn on whether the court has varied from the Guidelines range, and, if it has, on the magnitude of the variance.”). The District Court, however, clearly did not provide the requisite explanation for such lenient sentences.
Characterizing Defendants’ conduct as misguided corporal punishment and mistaken or bad parenting, the District Court refused to hold Defendants’ responsible for the children’s various injuries and medical conditions. Relying on the parties’ jury instruction dispute (addressed in Section III.A., supra), it claimed that “[t]he government rejected a jury charge that would define an abused or neglected child as suffering the degree of harm that its arguing I should say happened and that the child did suffer.” (A6576.) According to the District Court, this case implicated “a very naked verdict sheet,” in which the jury failed to indicate “what they were particu *395 larly offended by, how the acts linked up with a particular medical condition of the children.” (A6690.) “I have to cope with the fact, everybody has to cope with the fact that the live doctors who touched these children during the time that the children were in their care, up to the time in May 2010, or actually I believe it was April 2010 the child was brought to the hospital, these doctors did not find what the government is saying was going on, which is a systematic torture resulting in terrible injuries to vulnerable children.” (A6691.) The District Court wished that it knew what the jury found, but all it had were findings that Defendants committed acts of cruelty and neglect that caused harm: “I don’t know the extent of harm. And I don’t know whether the jury bought that all of these physical conditions that were explained to the satisfaction of medical doctors at the time the children were examined, up until April of 2010, I don’t know that the jury found that they are the result of massive, horrible, criminal, sadistic abuse as a result of a five-year conspiracy to do that.” (A6700-A6701.)
However, “a guilty verdict, not set aside, binds the sentencing court to accept the facts necessarily implicit in the verdict.” United States v. Boggi, 74 F.3d 470, 478-79 (3d Cir. 1996) (quoting United States v. Weston, 960 F.2d 212, 218 (1st Cir. 1992)). We agree with the government that the District Court in this case effectively “substitut[ed] its view of the evidence ... for the jury’s verdict.” United States v. Bertling, 611 F.3d 477, 481 (8th Cir. 2004) (citing United States v. Rivera, 411 F.3d 864, 866 (7th Cir. 2005)).
The government admittedly does read too much into the jury’s verdict. Specifically, the jury never explicitly found that Defendants “ ‘torture[d]’ three young adopted children over a five-year period.” (Appellant’s Brief at 1 (quoting A6360).) The indictment did not charge Defendants with “torture,” and the jury was never instructed that they had to find that Defendants “tortured” the children. Given the expansive nature of the child endangerment instructions as well as the allegations against Defendants (involving numerous acts of abuse committed over the course of a five-year conspiracy), we recognize the difficulty in connecting each count with a specific incident or a particular injury or condition.
Nevertheless, the jury did find Defendants guilty of conspiracy to endanger the welfare of a child. Carolyn was found guilty on eleven counts of child endangerment while John was convicted on nine such counts. The jury was instructed that “cruelty” consists of either — (a) inflicting unnecessarily severe corporal punishment, (b) inflicting upon a child unnecessary suffering or pain, either mental or physical, or habitually tormenting, vexing or afflicting a child, (c) any act of omission or commission whereby unnecessary pain and suffering (whether mental or physical) is caused or permitted to be inflicted on a child; or (d) exposing a child to unnecessary hardship, fatigue, or mental or physical strains that may tend to injure the health or physical well-being of the child. The District Court defined “neglect” as failing to provide proper and sufficient food, clothing, maintenance, medical attendance, or surgical treatment, or the failure to do or permit to be done any act necessary for the child’s physical well-being. The government also established beyond a reasonable doubt that Defendants knew their conduct would cause the harm or would inflict cruelty. The jury was even specifically instructed on both the permissible use of corporal punishment and a “Good Faith Defense” — and yet it still returned guilty verdicts on multiple counts against Defendants.
*396 While the parties may contest causation, the children clearly suffered various injuries and had a number of serious medical conditions. Joshua had a life-threatening bile duct perforation, a serious brain injury, a fractured skull, a fractured right arm, a spinal problem, and a gangrenous finger that required partial amputation. He also was admitted to the hospital with an extensive case of scalded skin syndrome, a skin condition that causes skin to peel off. J had bruises on her body, and C’s body was covered with marks, scars, and lesions. C was hospitalized in January 2010 with hy-pernatremia, i.e., high sodium levels and dehydration. Normal sodium levels are generally between 133 to 143, and 10 points above normal levels is considered dangerous. C’s sodium level (181) was so high that her doctor “was surprised she was still alive and functioning in the emergency department.” (A922-A923.) She was again hospitalized in April 2010 for the same condition. This time her sodium level (195) was “[r]are for any living person” (A572) and was “at the margins of what you can survive” (A3405). Furthermore, evidence was introduced indicating that C’s arm was fractured. The children, especially Joshua and C, did not really grow (and even regressed) during their time with Defendants. For example, Joshua weighed less than he did at 11 months just three weeks before his third birthday. He weighed, at the age of two years and 11 months, “as much as a baby that is less than one year old.” (A4275.) At the age of approximately one year and 10 months, C weighed the same as the average 4½-month-old baby and less than she had weighed at nine months. Following their removal from Defendants’ custody, J and C grew quickly (with C doubling her weight in several months).
For each substantive count, the jury instructions reiterated the factual allegations set forth in the indictment. The instruction for Count 2, for example, stated the following:
Count Two alleges that from in or about March 2006 through on or about May 8, 2008, within the special maritime and territorial jurisdiction of the United States, at Picatinny Arsenal Installation, in Morris County, in the District of New Jersey, and elsewhere, the defendants, Carolyn Jackson and John E. Jackson, having a legal duty for the care of and having assumed responsibility for the care of Joshua Jackson, a/k/a “Joshua Kennedy, ” born May 13, 2005, knowingly caused harm to Joshua by withholding sufficient nourishment and food from him, and made Joshua a neglected child, and a child upon whom cruelty has been inflicted, as I have defined for you previously, in violation of Title 18, United States Code, Sections 13 and 2, and N.J.S.A. Section 2C:24-4a.
(A6019.) Likewise, the instruction for Count 7 stated that Defendants knowingly caused harm to C by withholding sufficient nourishment and food, and the instructions for Counts 4 and 8 repeated the allegations that Defendants knowingly caused harm by withholding adequate water from J and C (respectively). The Count 3, 6, and 12 instructions respectively stated that Defendants “knowingly caused harm to [Joshua, J, and C] by physically assaulting [Joshua, J, and C] with various objects and with their hands.” (A6021, A6024, A6030.) The jury was told that Counts 5 and 9 “alleges that” Defendants “knowingly caused harm to [J and C, respectively] by forcing [them] to ingest hot sauce, red pepper flakes, and raw onion” [in the case of J] (A6023) or “hot sauce and red peppers [in the case of C]” (A6027). The instruction for Count 11 stated that Defendants “knowingly caused harm to [C] by withholding prompt and proper medical care for her dehydration and elevated sodi *397 um levels.” (A6029.) The Defendants’ verdict sheets similarly set forth these factual allegations under each respective count. For instance, the form stated for Count 3: “(Endangering the Welfare of a Child: Physically assaulting JOSHUA JACKSON with various objects and with their hands).” (A6054, A6058.) The District Court asked for the jury’s verdict using these basic allegations to identify each count. For example, the jury foreperson was asked with respect to Carolyn: “As to Count Two. Endangering the Welfare of a Child: Withholding sufficient nourishment and food from Joshua Jackson?” (A5963.) The answer was, “Guilty.” (Id.)
It defies common sense to believe that the jury found that Defendants physically assaulted their adopted children, withheld sufficient nourishment and water from them, and forced them to ingest hot sauce, red pepper flakes, and raw onion — but that such conduct did not cause the marks and bruises, the malnourishment, the hyperna-tremia, and the children’s other injuries and medical issues. In fact, the instruction for Count 10 was explicit on the question of causation:
Count Ten alleges that from on or about April 10, 2010 through on or about April 15, 2010, within the special maritime and territorial jurisdiction of the United States, at Picatinny Arsenal Installation, in Morris County, in the District of New Jersey, and elsewhere, the defendants, Carolyn Jackson and John E. Jackson, having a legal duty for the care of and having assumed responsibility for the care of [C], born April 7, 2008, knowingly caused harm to [C] by causing her to ingest excessive sodium and a sodium-laden substance while restricting her fluid intake, causing [C] to suffer hyper-natremia and dehydration, a life-threatening condition, and made [C] a neglected child, and a child upon whom cruelty has been inflicted, as I have defined for you previously, in violation of Title 18, United States Code Sections 13 and 2, and N.J.S.A. Section 2C:24-4a.
(A6028.) The jury returned a guilty verdict on this count as to Carolyn.
Given these circumstances, the District Court committed reversible error by downplaying the severity of Defendants’ criminal misconduct. According to John, “[t]he government incorrectly asserts that the court erroneously minimized the defendants’ conduct as ‘mistaken,’ ‘merely “foolish,” ’, or ‘bad parenting.’ ” (John’s Brief at 46 (quoting Appellant’s Brief at 57-59).) “While the court indeed uttered these particular words during the over ten-hour sentencing hearing, they do not, individually or collectively, reflect the court’s view of the offenses as trivial.” (Id.) John goes on to claim that the District Court fully took into account his role in the offenses. Although the District Court did acknowledge, for instance, that it was satisfied that Defendants committed a second degree offense and that the children suffered pain, its more dismissive sentiments cannot be set aside so easily. After all, it did impose lenient sentences, while “reject[ing] many of the government’s claims regarding causation and degree of harm.” (Id. at 9 (emphasis omitted).) Carolyn herself continues to minimize the offenses she committed by indicating (like the District Court) that Defendants could have been charged with a crime of the fourth degree under Title 9.
While John was clearly less culpable than his wife and thereby deserved a shorter sentence than she should have received, the District Court unduly minimized his role here. Simply put, this was not a case in which (as the District Court put it) he merely “watched” and “tolerated” Carolyn’s conduct. (A6708.) On the contrary, the jury found that John conspired — i.e., agreed — with Carolyn to en *398 danger the welfare of a child — and that he was criminally liable for nine substantive child endangerment counts. In fact, he was found guilty of the same substantive offenses as Carolyn,[17] with the exception of the charges for withholding sufficient nourishment and food from J and for causing C to ingest excessive sodium and a sodium-laden substance while restricting C’s fluid intake.
Accordingly, the sentences imposed failed to “reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense” — as well as to account for the “nature and characteristics of the offense.” Given the serious harm that the jury indicated Defendants inflicted on Joshua, J, and C, this was not a simple case of bad or misguided parenting. Nevertheless, the District Court indicated that what Carolyn was attempting to do was actually brave: “But, let’s not forget, five kids in the house, three of them being home schooled. Stupid to think you could do it all. If it had worked out, if it had worked out, it would have been called brave. Just remember that everybody. If it had worked out, that would have been called brave.” (A6734.) How is it “brave” to make a young girl ingest excessive sodium and then deny her adequate medical care when this excessive sodium causes a life-threatening medical condition? While we do not suggest at this time that the District Court must accept the sentences proposed by the government, it was also inappropriate, especially in the light of the severity of the injuries inflicted in this case, to compare the government’s position to a football game:
Nineteen years for Carolyn Jackson for this? Are you kidding me? Fifteen years for Mr. Jackson for this? Are you kidding me? Why can’t people think clearly. This is not a game. This is not the Giants versus Miami. This is not how many touchdowns do we win by. This is life. And if you want the proportionality, I know they say the same offense. We don’t have a same offense. This is one of a kind. Let’s hope the government is able to duck another one. Let’s hope I am. But, the bottom line is, this is serious, 19 years and 15 years, give everybody a break and let’s get real.
(A6729.) Stating that society as a whole was not harmed by Defendants, the District Court observed that “[t]hey were not running around State lines, finding people, committing real federal offenses. Real ones.” (A6731.) Even if the District Court was merely responding to a specific argument the government raised with respect to deterrence (i.e., that Defendants were a threat to their future grandchildren), it still minimized the seriousness of their conduct as compared with so-called “real federal offenses.”
The District Court understandably took into account the collateral consequences facing Defendants as a result of their convictions and underlying conduct. Specifically, it noted that they lost custody of their biological children (a decision that was partially overturned on appeal), that lengthier sentences would further remove them from two of their biological children’s lives, *399 and that they were now “dead” to their third biological child (JJ). John also lost his military career and his pension — he was discharged from the United States Army under other than honorable conditions for unacceptable conduct. Yet these consequences, which were the understandable results of their own criminal conduct, must be weighed against the harm they caused to the actual victims in this case. If anything, the losses they have incurred demonstrate that this is not a case of disadvantaged individuals who may have believed they had no choice but to engage in criminal conduct. Instead, Defendants were the well-educated and respected parents of several biological and adopted children, and John, in particular, was a career military officer with twenty-two years of service. Yet they still endangered the welfare of their children despite their many advantages.
According to John, the government’s theory rests on the premise that probation is not punitive, and it ignores the $15,000 fine and the requirement that John serve 400 hours of community service. We do not dispute the punitive nature of probation or the relevance of the other components of John’s sentence. Instead, we simply agree with the government that, under these specific circumstances, the District Court’s sentence of probation (and a fine and community service) did not really take account the seriousness of John’s offense, the need to promote respect for the law and to provide just punishment, and the nature and circumstances of the offense. We further note that, even under the state sentencing scheme, there is a presumption of imprisonment for second degree offenses, which is overcome only when the sentencing judge finds that imprisonment would constitute a serious injustice overriding the need to deter others. See § 2C:44-1d.
Section 3553 also requires the sentencing court to consider the issue of deterrence. The lenient sentences imposed here clearly failed to afford either specific or general deterrence. The District Court stated that “everything that [John] lost is deterrence, both specific and general.” (A6725.) “And everything that the Army may want in terms of showing that it doesn’t like things like this going on at the base, you have somebody that high up who’s taken down, that all happened already.” (Id.) With respect to Carolyn, it indicated that her prison sentence would demonstrate that her conduct was intolerable. However, it also observed that: “I don’t need to be worried about doing something with the sentence to deter. I really have a problem with saying under the ACA I have to be doing Army base cleanup. That’s not what the sentence is about. And I specifically reject that that should be a piece in terms of the deterrence.” (A6726-A6727.) With respect to the need for specific deterrence, we note that the criminal conduct involved conspiracy and various acts of neglect and cruelty committed over a period of time against three different victims. Cf., e.g., United States v. Kane, 639 F.3d 1121, 1131-32 (8th Cir. 2011) (“Far from demonstrating Kane posed no risk to recidivate, we observed, ‘The facts show Kane repeated her crime over and over again. Instead of protecting her daughter and choosing to stop participating in her daughter’s abuse after the first, or 50th, or 150th molestation, Kane continued to hold her daughter down or block the door on more than 200 occasions while Champion sexually violated the child.’ ” (quoting United States v. Kane, 552 F.3d 748, 753 (8th Cir. 2009))). Especially given the District Court’s statement that, “if it had worked out, [the parenting] would have been called brave,” (A6734), the sentences “convey to Defendants (and others who may share their parenting ‘phi *400 losophy’) that their conduct might not have been so terrible after all.” (Appellant’s Brief at 69 (citation omitted)).
Section 3553(a)(6) directs the sentencing court to consider “the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.” According to the government, the District Court overlooked other federal child abuse cases by focusing on state sentencing policies and hypothetical state sentences. According to John, most of the federal cases cited by the government are distinguishable (specifically all but one implicated federal murder charges). The District Court also noted that the government “settled the case through a plea of somebody who was using a platform called KIK, had 600 phone calls to young girls, met 6 of them, had sex with them.” (A6728.) The government was satisfied with a twenty-year sentence even though the conduct in that case was significantly more harmful than what occurred here. But the government still sought “19 years [for Carolyn] and 15 years [for John].” (Id.) Nevertheless, we question how this other case (in which the defendant pled guilty and still received a twenty-year sentence) justifies sentences of 24 months’ incarceration and probation. The District Court further referred to a New Jersey state court proceeding in which the defendant was sentenced to probation where a hypernatremia episode resulted in permanent brain damage. However, one of the federal cases cited by the government “involved a prosecution for a state offense under the ACA, i.e., willfully and maliciously engaging in child abuse under Oklahoma law” in which the defendant received a sentence of 144 months. (John’s Brief at 40-41 (citing United States v. Hill, No. 5:11-cr-00152-F (W.D. Okla.)).) We have already observed that, while the District Court went too far by considering state sentencing practices to the exclusion of federal sentencing principles, a sentencing court “likely can consider what a state defendant would receive if he had been prosecuted in state court” (Appellant’s Brief at 52.) Even so, there is still a presumption of imprisonment for offenses of the second degree under New Jersey law. See § 2C:44-1d. In addition, “crimes involving multiple victims represent an especially suitable circumstance for the imposition of consecutive sentences.” State v. Molina, 168 N.J. 436, 775 A.2d 509, 512 (2001) (citing State v. Carey, 168 N.J. 413, 775 A.2d 495, 504 (2001)); see also, e.g., N.J. Stat. Ann. § 2C:43-6b (authorizing sentencing court to impose periods of parole ineligibility where it is clearly convinced that aggravating factors substantially outweigh mitigating factors). In addition, the District Court should also consider on remand a recent state court disposition in which the judge “imposed a 25-year sentence on a mother for the manslaughter of her daughter and two 10-year consecutive sentences for the endangerment of her other two children.” (Appellant’s Reply Brief at 23 n.14 (emphasis omitted) (citing State v. Rezireksyon, No. 11-003445 (Essex County)).)
We also agree with the government that the sentences did not properly account for “the history and characteristics” of these two Defendants.
Admittedly, Defendants did express some remorse for their actions, although at the same time they offered justifications for what they had done or focused on what they suffered as a result of their conduct. Even the government acknowledges that “John ‘extended] a sincere apology to all of my children.’ ” (Appellant’s Brief at 72 (citing A6632-A6633).) Yet he also claimed that “[w]ith all my heart I believed that I was rearing all of my children with lawful *401 discipline.” (A6633.) In a written statement, Carolyn asserted that she was heartbroken over her mistakes as a parent. While she claimed at the sentencing hearing that she took responsibility for her actions and “won’t make excuses” (A6630), she also stated that “I probably was not equipped to handle that responsibility” (A6629). Carolyn, like the District Court, focused on what she had lost as a result of her own actions. Asserting that “I would like to tell you that I directly feel like I have lost what’s most important to me, and that’s my family,” she explained that, “as [JJ] eloquently demonstrated this morning, he, [J] and [C] will never be a part of our family again.” (A6630.) While the District Court credited Defendants with how they conducted themselves during JJ’s testimony, Carolyn’s defense counsel vigorously attacked him and his credibility. He was called a “liar” (A2173), a “habitual” liar (A5742), a “pathological” liar (A2486), a “disruptive” kid (A2246), and a “marionette” (A5744). Character witnesses were called to attack his reputation. See, e.g., Kane, 639 F.3d at 1136 (“Instead of accepting responsibility for her crimes, Kane challenged the truthfulness of her child’s testimony at trial, calling the child a liar, as the child mustered the courage to confront her abusers.”).
More importantly, the government appropriately takes issue with the emphasis that the District Court placed on John’s military record. The District Court turned to a Sentencing Commission policy statement stating that “[m]ilitary service may be relevant in determining whether a departure is warranted, if the military service, individually or in combination with other offender characteristics, is present to an unusual degree and distinguishes the case from the typical cases covered by the guidelines.” U.S.S.G. § 5H1.11; see also, e.g., § 3553(a)(5) (requiring court to consider “any pertinent policy statement”). According to the District Court:
So, what stands out in the 3553 and 3553(a) analysis is what role that military service should play. The focal point of the defense’s argument, quite different argument than presented for Mrs. Jackson, it was something that totally guided the way the family lived. But, apparently Mr. Jackson was a stellar soldier. I don’t think we think enough about that, what that means in this day and age when somebody chooses to be a soldier. And as this man did, chose when he was young and stuck it out and moved his family around and sought to excel and apparently was excelling.
I thought a troubling point came, Miss Jampol [an Assistant United States Attorney] kind of came close to it, Mr. Shumofsky [another federal prosecutor] came down on it with two feet when in his closing remarks to the jury, he said that to the extent that Mr. Jackson is characterized as not really being around for some of the abusive acts ascribed to both parties, there came a point when he was back from his tour in Iraq and he didn’t have Iraq to hide behind anymore.
I don’t think that’s what military service is. I don’t know if he would say that again. Mr. Shumofsky, you argued very hard, and I admire your zeal, but Iraq is not something to hide behind. Military service is something, frankly, to praise when it is pursued as Mr. Jackson did. So, we have that.
(A6705-A6706.) The District Court “put [John] in a separate category” because of his military service:
History and characteristics of the defendant, we’ve talked about his military career. And I put him in a separate category, rightly or wrongly, of citizens before this Court because of that military service. Because of the times we *402 are in when it is volunteer service. Because of the quality of the service. Because of the hardship of his family that was subjected to his military service. Because of the risks that he took when he went abroad to fight. Because he was in combat. I believe it was wrong to walk away from that. So history and characteristics and of course an unblemished criminal record.
(A6717.) It also applied this line of reasoning to Carolyji. “In recognizing whether I would give her prison time at all and recognizing when I say that Mr. Jackson is exceptional, she was exceptional too. She was an Army wife.” (A6732.)
While it appears undisputed that military service can be taken into account in fashioning an appropriate sentence, the District Court went too far in this case. In particular, it was improper to place members of the military (and their families) into “a separate category.” We certainly do not question the great sacrifices made by men and women who volunteer to defend this country — as well as their families. However, the military does not constitute some separate caste or class entitled to special rights or privileges not shared by other Americans. Even the policy guideline states that a departure may be appropriate where military service is present to an “unusual degree” and distinguishes the case from the typical cases covered by the Guidelines. In turn, neither the District Court nor Carolyn herself cite to any case applying § 5H1.11 to military spouses or other family members. John’s military service was also used as a defense at the trial itself, with the defense claiming that he did not know what was happening to the children because he was serving in Iraq. In any event, his stellar and admirable record as a soldier did little, if anything, to mitigate the harm suffered by Joshua, J, and C.
In fact, it is undisputed that these crimes occurred despite the fact that John was a well-educated and respected member of the community who had obtained the rank of major in the United States Army. Like her husband, Carolyn had a college education, and, having earned a degree in Individual and Family Studies, she even briefly worked as a teacher. Both Defendants raised several biological children, and received training about parenting and child welfare in connection with the adoptions.
Finally, we are troubled by the particular emphasis that the District Court placed on Defendants’ appearance and conduct in (and around) the courtroom. It stated the following:
And I find too, and this is very important, not only have I have read all of this stuff, not only have I read stuff you haven’t seen, but, I’ve watched the Jack-sons, many, many times come and go in this courthouse. I have seen them in the corridors and I have seen other defendants. I have seen how people come in dressed very sloppily, just lollygagging around in the pews, bringing in food, you brought it in today and just kind of treating this courtroom like a luncheonette.
That’s not the way the Jacksons have ever behaved. They have had long car rides. They are always on time. Always on time. They are interacting with the lawyers. One of the things a Judge sees, I tell young lawyers this over and over again, we see how you interact with your clients. If you don’t like your clients or if your clients are real big swift pains in the neck, we see it. You can’t hide it. We see it.
I have seen nothing but respect between these people and their lawyers, and respect given to court personnel and to me. You don’t just do that day after *403 day for over two years, not everyday, but during the time these proceedings have lumbered through this courtroom, without saying something about your character. And that is inconsistent with the kind of monstrosities that the government would suggest were committed upon these little girls, and inconsistent with having the kind of vindictiveness against their son that is suggested.
(A6722-A6723.) Is it really appropriate to impose sentences of probation or two years of imprisonment because a defendant’s attorney did not exhibit any visible animosity to his or her own client in the courthouse? Defendants’ disciplined attitude in the courthouse actually is not too surprising given the fact that John was an army officer (and Carolyn was his spouse). If anything, it would seem that this same attitude may explain why they used unnecessarily severe corporal punishment when three very young children failed to measure up to their exacting standards. In any event, it was the jury that found that Defendants agreed to endanger — and endangered — the welfare of Joshua, J, and C, which, as the jury instructions indicated, resulted in a number of serious injuries and medical condition. How could one say that, because a defendant acted in a courteous manner, he or she was incapable of committing a “monstrosity” — when the jury returned a guilty verdict on a charge that the defendant “knowingly caused harm to [a young child] by causing her to ingest excessive sodium and a sodium-laden substance while restricting her fluid intake, causing [the child] to suffer hyper-natremia and dehydration, a life-threatening condition”? (A6028.) Under these circumstances, we do not believe that the sentences were substantively reasonable.[18]
IV.
For the foregoing reasons, we will vacate the sentences imposed by the District Court and remand for further proceedings consistent with this opinion.

. An earlier trial ended in a mistrial when the government asked a question suggesting that Joshua was no longer alive.

. The District Court also struck the assertions regarding the offense conduct set forth in the Presentence Investigation Reports ("PSRs”) because they were written by the government, no independent investigation was conducted by the Probation Office, no countervailing evidence was referenced, and certain paragraphs were related to extraneous guidelines.
Additionally, the District Court had the benefit of a lengthy decision by the Appellate Division of the New Jersey Superior Court, which affirmed the judicial determination that Defendants abused and neglected J, C, and JJ and the termination of their parental rights as to these three children but reversed the state family judge’s finding of abuse and neglect with respect to two other children [their other two biological children]. See N.J. Div. of Child Prot. & Permanency v. C.J., 2014 WL 3881311 (N.J. Super. Ct. App. Div. Aug. 8, 2014) (per curiam); see also N.J. Div. of Child Prot. & Permanency v. C.J., 2016 WL 4608231 (N.J. Super. Ct. App. Div. Sept. 6, 2016) (per curiam) (holding that trial court erred in granting kinship legal guardianship as to the two biological children).

. No one suggests that the sentencing court should decide whether there is a "sufficiently analogous” offense guideline based on its own findings of fact.

. In a § 2X5.1 appeal, the Ninth Circuit refused to express an opinion "as to whether the district court’s look to the allegations in the indictment to select the appropriate guideline would have been permissible in this case." United States v. McEnry, 659 F.3d 893, 901 n.13 (9th Cir. 2011). "Moreover, because this case does not present a situation where more than one guideline is 'sufficiently analogous' to McEnry’s crime of conviction, U.S.S.G. § 2X5.1, we express no opinion about whether the court might be permitted to look to more facts in such a case.” Id. An unpublished per curiam disposition by the Fourth Circuit was the only decision cited by the government that looked to the facts alleged in the indictment as part of its "sufficiently analogous” guideline analysis. See United States v. Centner, 116 F.3d 473, 1997 WL 328766, at *1-*4 (4th Cir. 1997) (per curiam).

. The Eighth Circuit thereby quoted from an older version of the commentary. However, the current version of this language is essentially indistinguishable. See § 2X5.1 cmt. background ("The court is required to determine if there is a sufficiently analogous offense guideline, and, if so, to apply the guideline that is most analogous. In a case in which there is no sufficiently analogous guideline, the provisions of 18 U.S.C. § 3553 control.”)

. While the government noted below that "certain things, such as degree of harm or danger are historically elements of assault, they are not elements of the crimes for which *382 these defendants were convicted” (A6460), such "things” are not elements of simple assault. We further observe that Carolyn’s defense counsel indicated that the federal assault counts were redundant because "there’s already a charge of neglect by administering salt or sodium-laden substances while withholding water.” (A5377.) At a presentencing hearing tentatively addressing, inter alia, how to handle various issues identified in a letter from Carolyn’s attorney (on behalf of both Defendants), Carolyn’s attorney took issue with the PSR’s identification of "aggravated assault” as "the analogous offense.” (A6083.) "We think that's wrong. Analogous offense is what they call a minor assault. A different guideline. We think a matter of law and that could be briefed easily. And if we are right, it eliminates certain enhancements.” (Id.)

. In Cothran, this Court found that a particular offense guideline was more - analogous than another offense guideline on the grounds that, inter alia, the other guideline’s base offense level lacked an element of the offense of conviction. Specifically, we observed that U.S.S.G. § 2A6.1 (Threatening or Harassing Communications) constituted the "most analogous” offense guideline because "there is a scienter element present in the base offense level for § 2A6.1 that is not present in the base offense level of § 2K1.5 [ (Possessing Dangerous Weapons or Materials While Boarding or Abroad an Aircraft) ].” Cothran, 286 F.3d at 178. Accordingly, ”[t]o most accurately analogize Cothran’s act under § 2K1.5, we would therefore have to increase his base offense level to 24 because he knowingly conveyed the false threat.” Id. As the District Court noted in this case, certain enhance *383 ments under the assault and aggravated assault guidelines (“the abuse of trust, the vulnerable victim, the obstruction of justice”) would appear to apply "to every child endangerment charge.” (A6576.) However, we addressed the issue of whether § 2K1.5 or § 2A6.1 constituted the "most analogous” offense guideline — and not whether § 2K1.5 satisfied the initial "sufficiently analogous” offense guideline requirement.

. In addition, we observe that the aggravated assault guideline was applied to a conviction under this Texas bodily injury provision in a precedential Fifth Circuit opinion. United States v. Bell, 993 F.2d 427, 430 (5th Cir. 1993) (“In applying section 2A2.2, the district court relied on a finding that Bell injured his victim with intent to commit another felony— the sexual assault. Relying on his claim that insufficient evidence supported the aggravated sexual assault conviction, Bell asserts that *384 the district court should have sentenced him under U.S.S.G. § 2A2.3 on the second count. Because we find Bell’s conviction under 18 U.S.C. § 2241(c) fully supported by the record, this assignment of error necessarily founders.” (footnote omitted)). Finally, this non-precedential Fifth Circuit ruling must be weighed against other non-precedential dispositions applying the aggravated assault guideline to various assimilated abuse convictions. See United States v. Bailey, 169 Fed.Appx. 815, 823-24 (5th Cir. 2006) (finding no error in district court’s use of aggravated assault guideline as "most analogous” guideline offense for conviction for cruelty to juvenile); United States v. Truax, 69 Fed.Appx. 219, 220-21 (6th Cir. June 6, 2003) (district court applied aggravated assault guideline to conviction for first degree criminal abuse of child); Centner, 116 F.3d 473, at *3 ("As we concluded above, U.S.S.G. §§ 2X2.1 and 2A2.2 are sufficiently analogous to warrant their application to Centner’s offense [of knowingly and willfully causing children be in place where they could be abused].” (footnote omitted)).

. The parties had a disagreement below regarding the degree of harm needed to sustain a conviction for endangering the welfare of a child under § 2C:24-4a. Carolyn sought an instruction incorporating "the definition of 'abused or neglected child’ contained in N.J.S.A. § 9:6-8.21 or, alternatively, the language approved in [a 2002 Appellate Division ruling].” (Carolyn's Brief at 18-19 (citing State v. T.C., 347 N.J.Super. 219, 789 A.2d 173, 186 (2002) ("Abused or neglect child *385 means a child ... whose parent or guardian ... inflicts ... physical injury ... which causes or creates a substantial risk of protracted impairment of physical or emotional health.”)).) While the government opposed this proposal, "to the extent that the Court is concerned that at sentencing it would be lacking information sufficient to understand the jury’s conclusions about the severity of this offense, the government is willing to have the Court charge a bifurcated instruction [on degree of harm] in verdict form, where the jury is instructed after they’ve reached their verdicts on the initial instructions.” (A5460, see also A5467 ("But, you know, we are comfortable as an alternative bifurcated verdict, putting before the jury [8.21].”) Carolyn’s attorney stated that "as an alternative we would be comfortable instructing everything and giving the lesser included offense, not the bifurcation the government is asking for, but a lesser included offense.” (A5469.)
The District Court ultimately refused to ask the jury to determine the extent of any injuries, while indicating that its decision on this point could have an effect at sentencing: "If the government prevails, in terms of not adding this definition of substantial harm to the endangerment that’s charged then we may have an issue coming up, should there be a conviction, as to the extent of culpability, but the government will have culpability.” (A5475.)

. The District Court granted judgments of acquittal on charges of assault with a dangerous weapon with intent to do bodily harm and intentional assault resulting in serious bodily injury. Defendants were not charged with simple assault under the federal assault provision.

. As we explain in Section III.B., we reject the notion that it would be improper to engage in the sort of fact-finding (under a preponderance of the evidence standard) that is necessary to calculate the advisory Guidelines range once an offense guideline-is identified. In Section III.C., we consider whether application of the Guidelines would be consistent with the ACA's "like punishment” requirement.

. Title 9 also incorporates criminal provisions. See, e.g., § 9:6-3 ("crime of fourth degree”). We further note that Title 9 does not merely apply to parents or legal guardians. Section 9:6-8.21a specifies that "[pjarent or guardian” includes, inter alia, "a teacher, employee, or volunteer” of an institution who is responsible for the child's welfare, any other staff person regardless of whether he or she is responsible for the care or supervision of the child, and a teaching staff member or other employee of a day school. In this case, the jury was instructed that "[a] person who has assumed responsibility for the care of a child includes any person who assumes a general and ongoing responsibility for the care of the child and who establishes a continuing or regular supervisory or caretaker relationship with the child.” (A6012.) Section 2C:24-4a also provides that "any other person” who engages in conduct or who causes harm as described in this paragraph to the child is guilty of a crime of the third degree.

. According to Carolyn, any error was harmless. Nevertheless, Carolyn’s burden to establish harmless error is a heavy one, and it is one that she clearly does not meet here. See, e.g., United States v. Zabielski, 711 F.3d 381, 387 (3d Cir. 2013) (noting that burden is very difficult to satisfy absent clear statement by district court that same sentence would have been imposed); United States v. Wright, 642 F.3d 148, 154 n.6 (3d Cir. 2011) (stating that error is not harmless unless alternative sentence was product of three-step Booker sentencing process).

. Likewise, Carolyn argues that a defendant sentenced under New Jersey law to ten years' imprisonment would have a "real time” sentence of around 23 months. "Looked at another way, the 19 ½ years [for Carolyn] sought by the government exceeds the length of time a person would serve on a 70-year sentence.” (Carolyn's Brief at 59 (footnote omitted).) Carolyn further claims that the maximum parole eligibility time for a defendant sentenced to a seven-year term of imprisonment is approximately 21 months.

. Asserting that the ACA "represents a deliberate choice to promote intrastate uniformity above interstate uniformity when a defendant commits a crime, otherwise punishable by state law, on federal land,” the Fifth Circuit determined that Texas law requiring concurrent sentences must be honored. United States v. Martinez, 274 F.3d 897, 908 (5th Cir. 2001) (citing Garcia, 893 F.2d at 253-54). However, Martinez addressed the maximum sentence allowed under state law (as opposed to anything resembling New Jersey's "real time” concept). Id. at 909 ("Texas's choice to limit the length of all concurrent sentences deserves as much deference as does a choice to set the statutory maximum for an individual crime." (footnote omitted)). We also note that the Eighth Circuit refused to apply state law governing concurrent and consecutive sentences. Norquay, 905 F.2d at 1163.

. Upon finding these procedural errors in the sentences, Judge Fuentes would vacate and remand for resentencing without reaching the substantive unreasonableness of the sentences.

. The jury was charged on the theory of "Accomplice Liability; Aiding and Abetting (18 U.S.C. § 2(a)).” (A6042 (emphasis omitted).) The District Court also explained that the jury could find Defendants guilty of the substantive offenses "based on the legal rule that each member of a conspiracy is responsible for crimes and other acts committed by the other members, as long as those crimes and acts were committed to help further or achieve the objective of the conspiracy and were reasonably foreseeable to Carolyn Jackson and John E. Jackson as a necessary or natural consequence of the agreement.” (A6039.)

. However, we are also troubled by the government's surprising references to both murmurs of outrage from the gallery when the sentences were announced and a press report claiming that the District Court had essentially negated the guilty verdict. While the sentence imposed (and the process used) should promote respect for the law, see § 3553(a)(2)(A), a judge obviously should not sentence someone in order to curry favor with . the public or fail to exercise his or her own discretion under the three-step sentencing process so as to avoid public criticism. Furthermore, a press report cannot be used as evidence that. a court committed reversible error.